# CASES

## ARGUED AND DETERMINED

IN THE

# UNITED STATES CIRCUIT COURTS OF APPEALS AND THE CIRCUIT AND DISTRICT COURTS.

---

### THE ERSKINE M. PHELPS.

(Circuit Court of Appeals, Ninth Circuit.   May 31, 1904.)

No. 1,014.

1. SEAMEN—INJURY IN SERVICE—DUTY OF SHIP TO MAKE NEAREST PORT.

The master of a sailing ship on a voyage to Honolulu was not chargeable with a neglect of duty which renders the ship liable in damages because he did not return from the vicinity of Cape Horn to Port Stanley, Falkland Islands, which was the nearest port, and 540 miles distant, with a seaman who received an injury in which both bones of his leg below the knee were broken, where the mate, who had some surgical skill and experience, took charge of the injured man, and set the bones, which united firmly, but, by reason of the fracture being oblique, overlapped, producing a shortening of the leg, and where, while the ship could probably have made the islands in two or three days, the season was midwinter, when the days were short and cold and storms prevailed, and it was further shown without contradiction that the entrance of the harbor at Port Stanley by a ship of her size was very dangerous, and likely to take several days at that season, and that vessels went there only as a last resort, and in cases of dire necessity.

Appeal from the District Court of the United States for the District of Hawaii.

R. W. Breckons and Holmes & Stanley (Milton Andros, of counsel), for appellants.

T. McCants Stewart and J. J. Dunne, for appellee.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

GILBERT, Circuit Judge.   The appellee was an able-bodied seaman on the Erskine M. Phelps, a full-rigged four-masted ship of 2,715 registered tons, which sailed on May 1, 1903, from the port of Norfolk, Va., bound for the port of Honolulu, Hawaiian Islands.   On July 15, 1903, while in latitude 58° 29' south, longitude 65° 30' west, a little to the southward and westward of Cape Horn, the ship encountered

131 F.—1

very heavy gales, and was laboring heavily. About 6 o'clock in the evening, when the ship had just come about, and while the men were hauling at the forebraces, a large wave came over the port bow and completely buried the fore part of the ship. The appellee, who was hauling at the forebraces, was struck by the wave and thrown against the rail, and thereby sustained a fracture of both bones of the right leg at a point nearly midway between the ankle and the knee. The captain, knowing that the first mate had some medical skill, directed him to set the broken leg. The first mate accordingly did so. He testified, and it is not disputed, that he had served from 1894 to 1897 in the United States navy, and had received instruction in "first aid to the wounded," and had served 270 days in the Boer War, in which he said he had had plenty of experience, for the small commandoes had no surgeons, and the men had to help one another. The first mate, after setting the fractured bones, placed the appellee's leg in splints, bandaged it, and suspended it in a swing. The appellee was confined to his bunk until August 23, 1903, when he was carried out on the deck. Four days later, while walking on the deck with the support of a crutch and a cane, he slipped and fell, and his leg was again injured, probably broken. It was again bandaged and placed in a sling, and the appellee was confined to his bunk until about four days before September 15, 1903, the date of the arrival of the ship at Honolulu. On September 17, 1903, at his request, the appellee was taken to a hospital at Honolulu. It was there ascertained that the bones of the leg, which had been obliquely fractured, had firmly united, but that they overlapped, producing a shortening of the leg. The trial court found that the appellee was permanently injured and incapacitated from performing hard labor, but that there was no proof of the failure of the ship in its duty to him, except in the neglect to provide proper care and medical attention, which should have been done by putting into some convenient port for surgical treatment, and that the failure of the master so to deviate from his course constituted negligence for which the ship was liable in the sum of $1,800.

The accident occurred in the middle of the winter season. Eight others of the crew were injured at the same time, leaving nine men on duty. Of these nine men, the captain testified—and it is not denied—that two or three were useless on account of saltwater boils and ulcers. The same sea that caused the accident washed overboard the fore and main braces. Some of the braces were cut in twain by the iron shutters of the ports; some of them had to be spliced, and others replaced. Under these circumstances the captain was confronted with the question whether his duty to the injured seaman required him to take the appellee back to Port Stanley, in the Falkland Islands, for surgical treatment. The lower court held that it was his duty to have put into the nearest port to obtain such aid, "if it was reasonably possible for him to do so," and that he should have sailed for Port Stanley. At the time of the accident, as shown by computations made from the log of the first officer, the ship was 484 miles in a direct line from that port, and 540 miles as the ship would sail. The wind was favorable for sailing in that direction. The ship, with all sails set, and under favorable conditions, could make 288 miles per day. The captain, in giving his

reasons for not putting back to that port, said that he considered it sheer madness to attempt to enter the harbor of Port Stanley with the ship and crew in the condition in which they were. He testified that he was a master mariner of experience, and had sailed 35 times around the Horn. He admitted that he could very easily have gone back to the region of the Falkland Islands, but he testified that it was a stormy region, subject to continual sleet, hail, and snowstorms at that time of the year; that there was very little daylight, dark coming on at 4 o'clock in the afternoon and lasting until 8 o'clock in the morning, so that it was next to impossible to get a reliable observation from the sun; that if he had attempted Port Stanley with his ship and crew crippled as they were, he would have been in serious danger of running ashore and losing his ship; that the entrance to the harbor is less than one-half a mile wide; that there is no tug there; that there would have been great difficulty in working so long a ship into the entrance, since, even with a favorable wind, there is scarcely sufficient room to clear the entrance, and that with so long a ship half a mile is very scant room for sailing; that after entering the outer harbor it is dangerous to remain there, and it is necessary to proceed on into the inner harbor, for the reason that the water is from 36 to 38 fathoms deep, so as to make the anchorage insecure, and that in the outer harbor there was the further and probable danger of easterly gales; that the entrance to the inner harbor is but 250 yards in width. His evidence as to the hazardous nature of the entrance to Port Stanley was corroborated by five other witnesses, master mariners of experience, one of whom testified that in 1889 he had sailed into Port Stanley for repairs, and that he was 24 days outside the harbor before he could get in, and that in the outer harbor he paid out both anchors to the last fathom, but that the ship dragged her anchors, and went within 20 yards of the rocks, and that he remained in the outer harbor from 14 to 16 days. The testimony of all these witnesses was that no one would come to Port Stanley except as a last resort, or in a case of dire necessity. There was no evidence even tending to contradict this testimony, except an extract from the Encyclopedia Britannica, which, after referring to the establishment of stores and workshops at Port Stanley, said:

"And now ships can be repaired and provided in every way much better and more cheaply there than at any of the South American ports; a matter of much importance, seeing that a greater amount of injury is done annually to shipping passing near Cape Horn by severe weather than in any other locality in the world. The average number of ships entering Stanley Harbor in a year is about fifty, with an average tonnage of 20,000 tons."

Even if this extract be given the force of evidence, it goes no further than to show that a considerable number of ships do at some season of the year put into Port Stanley for repairs. But that is a statement not incompatible with the testimony of the witnesses that the entrance is extremely hazardous for a large ship, and that the port is only to be availed of in case of dire necessity.

In the case of The Iroquois, 118 Fed. 1003, 55 C. C. A. 497—a case in which a seaman was injured while at sea at a distance of 480 miles from Port Stanley—we held that the master should have either taken him into that port or to Valparaiso for treatment. But in that case the

injury was more severe than in the present case. The seaman sustained a fracture of two ribs as well as of both bones of his leg below the knee. There was no one on board who possessed any surgical knowledge or experience, and the bones of the leg never united. In that case, moreover, there was no evidence before the court of any difficulty in entering Port Stanley, and the accident occurred in the summer, instead of the winter, of that region. The Supreme Court, on appeal, with some hesitation affirmed our judgment, but only on the ground that the captain might have been negligent in not putting into Valparaiso. Said Mr. Justice Brown, speaking for the court:

"Each case must depend upon its own circumstances, having reference to the seriousness of the injury, the care that can be given the sailor on shipboard, the proximity of an intermediate port, the consequences of delay to the interests of the shipowner, the direction of the wind, and the probability of its continuing in the same direction, and the fact whether a surgeon is likely to be found with competent skill to take charge of the case. With reference to putting into port, all that can be demanded of the master is the exercise of reasonable judgment and the ordinary acquaintance of a seaman with the geography and resources of the country. He is not absolutely bound to put into such port if the cargo be such as would be seriously injured by the delay. Even the claims of humanity must be weighed in a balance with the loss that would probably occur to the owners of the ship and cargo. A seafaring life is a dangerous one. Accidents of this kind are peculiarly liable to occur, and the general principle of law that a person entering a dangerous employment is regarded as assuming the ordinary risks of such employment is peculiarly applicable to the case of seamen."

The court, in conclusion, said:

"As the decision of the District Court was unanimously affirmed by the Circuit Court of Appeals, we do not think there is any such preponderance of evidence as would justify us in disturbing their conclusions."

In view of that expression of the opinion of the Supreme Court and the circumstances of the present case, we do not think that the captain of the Erskine M. Phelps was negligent in not putting back to Port Stanley. But the trial court found, further, that the captain was negligent at a later date in not deviating from his course on August 6th, and putting into Valparaiso, which he could have reached by sailing nine days from that date. The captain testified that his reason for not going to Valparaiso was that at that time the weather was fine, and he had reason to believe that the bones of the appellee's leg had united, and that he was doing well. Three surgeons testified in the case—one for the appellee and two for the appellants. There is no substantial variance in their testimony. Their opinion was that, so far as the ultimate recovery of the appellee was concerned, nothing could have been done surgically after August 6th, and that from that time the conditions were as favorable on the ship as they would have been on land; that the motion of the ship would have no effect on the setting of the leg and its recovery if the leg were set and placed in a position where it could swing; that the best time to set it was as soon as possible after the fracture; and that, unless land could have been reached within two or three days from the time of the fracture, the appellee was practically as well off on board the ship as in a hospital. One of the surgeons testified that he found the appellee's right leg one

and one-quarter inches shorter than the other, but that he made no measurement. The other two measured it, and found it half an inch shorter than the other. But they all agreed that nature compensates, and in a measure corrects, such a shortening, and that an operation could be performed by breaking and resetting the bones, but that this could have been done as well on the arrival of the vessel in Honolulu as at Valparaiso or at Valdevia, three weeks after the accident. There was some difference of opinion as to the question of the permanence of the injury to the appellee by reason of the fracture of his leg if not further operated upon. Dr. Herbert testified that the appellee would ultimately have perfect use of his leg. Dr. Day thought that he would be able to follow his occupation, but that he would have to favor himself a little; that he would not be as nimble as he had been. Dr. Cooper considered the mending of the leg "a good job," and thought that the appellee would have a good leg—a leg that would enable him to earn a livelihood in any walk of life. When, on August 23d, the appellee was injured the second time by falling on the deck, the ship was as near to her port of destination as to any other. So far as the evidence goes, the shortening of the appellee's leg may have been caused by a second fracture sustained at that time. If that be true, the ship could not, in any view of the case, have been responsible for that injury. Considering the whole of the evidence as it is presented here, we think that the captain was not negligent at any point in the history of the case, and that the ship is not liable, therefore, in damages.

The decree is reversed, and the cause is remanded to the District Court, with instructions to dismiss the libel.