JOSEPH MAZZA, TRADING AS TRAVELER'S HOTEL & RESTAURANT, APPELLANT, v. DOMINIC A. CAVICCHIA, DIRECTOR, DIVISION OF ALCOHOLIC BEVERAGE CONTROL OF NEW JERSEY, RESPONDENT.

Argued March 1, 1954—Decided May 24, 1954.

*Mr. Julius Kramer* argued the cause for the appellant (*Messrs. Chandless, Weller & Kramer*, attorneys).

*Mr. Samuel B. Helfand*, Deputy Attorney-General, argued the cause for the respondent (*Mr. Grover C. Richman, Jr.*, Attorney-General of New Jersey, attorney).

The opinion of the court was delivered by
VANDERBILT, C. J.

## I.

This is an appeal from a judgment of the Appellate Division of the Superior Court affirming an order of the Director of the Division of Alcoholic Beverage Control suspending the appellant's license to sell alcoholic beverages.

The appellant operates the Traveler's Hotel & Restaurant, a two-story structure on the Paterson Plank Road in East Rutherford, and was the holder of a plenary retail consumption liquor license. Agents of the Division filed a complaint with the Director charging that on September 26 and 27, 1952, as well as on prior occasions, Mazza had violated Rule 5 of State Regulations No. 20 in that he had allowed lewdness and immoral activity on the premises and also that on September 27, 1952 and on other days prior thereto, he had permitted the sale of contraceptive devices on the premises contrary to Rule 9 of State Regulations No. 20. By notice issued September 30, 1952 Mazza was required to show cause why his license should not be revoked or suspended.

Pursuant thereto a hearing was held before a hearer of the Division. An inspector and two investigators of the Division were the only witnesses for the State. At the conclusion of the hearing the hearer advised the parties that the matter would be submitted to the Director for determination and that all parties would be advised of the result. Subsequently the hearer forwarded the record of the hearing to the Director together with a report of his findings and conclu-

sions, but a copy thereof was not furnished to Mazza. The Director found Mazza guilty of the charges and ordered the suspension of his license for 180 days and on appeal his order was affirmed by the Appellate Division of the Superior Court, 28 *N. J. Super.* 280 (1953).

Mazza appeals here asserting that his constitutional rights have been infringed, *N. J. Const.* 1947, *Art.* VI, *Sec.* V, *par.* 1, *clause* (*a*), in that he was denied due process and a fair hearing before the Division. It is unnecessary for us to determine each of the points raised because we are of the opinion that by reason of the failure to supply the appellant with a copy of the hearer's secret report to the Director the appellant was deprived of his right to due process and a fair hearing before the administrative tribunal. In order, however, to set at rest questions that may be of some importance in the field of administrative procedure, we will first deal with the other points raised by the appellant.

## II.

1. The appellant claims that there is no statutory authority for anyone other than the Director to conduct the hearing. The Alcoholic Beverage Law, *R. S.* 33 :1–23, provides, among other things, that "It shall be the duty" of the Director "to conduct hearings in accordance with this chapter" and also that "The enumeration of the above specific duties shall not be construed to limit or restrict in any way the general authority given [to him] by this chapter." *R. S.* 33 :1–31 authorizes the suspension or revocation of a license by the Director for violation "of rules and regulations" upon the giving of the required notice and "a reasonable opportunity to be heard." *R. S.* 33 :1–35 in effect at the time of this proceeding provided:

"For the purpose of any investigation, examination or inspection, revocation, rule to show cause and every other proceeding authorized under this chapter or appropriate for its enforcement, the commissioner*, *his deputy commissioners*, *attorneys and legal assistants designated to act on his behalf*, and each other issuing authority

may examine, under oath, any and all persons whatsoever and compel by subpoena the attendance of witnesses and the production of books, records, accounts, papers and documents of any person or persons and *the commissioner*\*, *his deputy commissioners*\* [*directors*], *inspectors and investigators and each other issuing authority may* take any oath or affirmation of any person to any deposition, statement, report or application required in the administration of this chapter * * *.'' (Emphasis supplied)

\* (The departmental changes enacted by *L.* 1948, *c.* 439, *sec.* 17 (*N. J. S. A.* 52:17B–17) transferred these powers to the Director.)

 From these provisions of the statute there is evident a clear legislative intent to permit the Director to delegate his authority to conduct hearings even though the duty to make the final decision rests solely in the Director; see *Horsman Dolls, Inc. v. State Unemployment Compensation Comm.*, 134 *N. J. L.* 77, 80 (*E. & A.* 1946), appeal dismissed 329 *U. S.* 693, 67 *S. Ct.* 635, 91 *L. Ed.* 606 (1947). Nor does such procedure constitute a deprivation of the appellant's right to due process of law, *Horsman Dolls, Inc. v. State Unemployment Compensation Comm., supra,* 134 *N. J. L.* 77, 81; *Morgan v. United States,* 298 *U. S.* 468, 481, 56 *S. Ct.* 906, 80 *L. Ed.* 1288, 1295 (1936); *Schwartz, The Model State Administrative Procedure Act—Analysis and Critique,* 7 *Rutgers L. Rev.* 431, 453 (1953).

 2. The appellant next challenges the validity of Rule 31 of State Regulations No. 20, claiming first that the Director was without legislative authority to issue it. This contention is without merit for the Legislature has specifically granted the Director the power to promulgate rules and regulations, *R. S.* 33:1–39; see *Franklin Stores Co. v. Burnett,* 120 *N. J. L.* 596 (*Sup. Ct.* 1938); *Greenspan v. Division of Alcoholic Beverage Control,* 12 *N. J.* 456, 459, 460 (1953).

 3. The appellant then questions the constitutionality of Rule 31 which provides:

"In disciplinary proceedings brought pursuant to the Alcoholic Beverage Law, it shall be sufficient, in order to establish the guilt of the licensee, to show that the violation was committed by an agent, servant or employee of the licensee. The fact that the licensee did not participate in the violation or that his agent, servant or employee acted contrary to instructions given to him by the

licensee or that the violation did not occur in the licensee's presence shall constitute no defense to the charges preferred in such disciplinary proceedings."

It is well settled that a state may without violating the due process clause of the Federal Constitution establish presumptions which according to general experience reasonably tend to prove the fact in question. *Hawker v. People of State of New York*, 170 *U. S.* 189, 195, 18 *S. Ct.* 573, 42 *L. Ed.* 1002, 1005–1006 (1898); *Hawes v. State of Georgia*, 258 *U. S.* 1, 2–5, 42 *S. Ct.* 204, 66 *L. Ed.* 431, 431–432 (1922). Rule 31 comes within this test as a reasonable presumption, *State v. Morris*, 94 *N. J. L.* 19 *(Sup. Ct.* 1919), affirmed 94 *N. J. L.* 567 *(E. & A.* 1920); *State v. Costa*, 11 *N. J.* 239, 246 (1953); *Greenbrier, Inc. v. Hock*, 14 *N. J. Super.* 39 *(App. Div.* 1951), certification den. 7 *N. J.* 581 (1951).

In addition it must be remembered that a license to sell intoxicating liquor is not a contract nor is it a property right. Rather it is a temporary permit or privilege to pursue an occupation which otherwise is illegal. *In re Schneider*, 12 *N. J. Super.* 449, 456 *(App. Div.* 1951). From the earliest history of our State the sale of intoxicating liquors has been treated in an exceptional manner by the Legislature. *Hudson Bergen County Retail Liquor Stores Ass'n. v. Board of Com'rs. of City of Hoboken*, 135 *N. J. L.* 502, 506 *(E. & A.* 1947). "It is a subject by itself, to the treatment of which all the analogies of the law appropriate to other topics cannot be applied." *Paul v. Gloucester County*, 50 *N. J. L.* 585, 595 *(E. & A.* 1888). "The sale of intoxicating liquor is in a class by itself." *Bumball v. Burnett*, 115 *N. J. L.* 254, 255 *(Sup. Ct.* 1935). "As it is a business attended with danger to the community it may * * * be entirely prohibited, or be permitted under such conditions as will limit to the utmost its evils." *Crowley v. Christensen*, 137 *U. S.* 86, 91, 11 *S. Ct.* 13, 15, 34 *L. Ed.* 620, 624 (1890).

The governmental power to regulate activities upon the licensed premises has uniformly been accorded liberal judicial support. *Board of Com'rs. of Town of Phillipsburg*

v. *Burnett*, 125 *N. J. L.* 157, 161 (*Sup. Ct.* 1940) ; *In re Larsen*, 17 *N. J. Super.* 564, 571 (*App. Div.* 1952).

"The right to regulate the sale of intoxicating liquors, by the Legislature, or by municipal or other authority under legislative power given, is within the police power of the state, and is practically limitless." *Meehan v. Board of Excise Commissioners*, 73 *N. J. L.* 382, 386 (*Sup. Ct.* 1906), affirmed 75 *N. J. L.* 557 (*E. & A.* 1908).

▇ It was clearly within the power of the Legislature to provide that the licensee should be liable for activities upon the licensed premises even in the absence of knowledge thereof by the licensee.

The question then arises as to whether the Legislature has granted the Director the authority to promulgate this rule. The Director has been given the duty "to supervise the manufacture, distribution and sale of alcoholic beverages in such a manner as to promote temperance. and eliminate the racketeer and bootlegger." (*R. S.* 33 :1-3). Under *R. S.* 33 :1-39 he is granted very broad and general powers :

"The commissioner [now Director] may make such general rules and regulations and such special rulings and findings as may be necessary for the proper regulation and control of the manufacture, sale and distribution of alcoholic beverages and the enforcement of this chapter, in addition thereto, and not inconsistent therewith, and may alter, amend, repeat and publish the same from time to time.

Such rules and regulations may cover the following subjects : * * * inspections, investigations, searches, seizures, findings and such activities as may become necessary from time to time ; * * * racketeering ; prostitution ; solicitation ; disorderly houses ; * * * disreputable characters ; * * * health and sanitary requirements ; standards of cleanliness, orderliness and decency ; * * * practices unduly designed to increase consumption of alcoholic beverages ; gifts of equipment, products and things of value ; and such other matters whatsoever as are or may become necessary in the fair, impartial, stringent and comprehensive administration of this chapter."

*R. S.* 33 :1-73 states that "This chapter is intended to be remedial of abuses inherent in liquor traffic and shall be liberally construed."

In *Franklin Stores Co. v. Burnett*, 120 *N. J. L.* 596 (*Sup. Ct.* 1938), there was an attack upon the validity of Rule 18 of the Alcoholic Beverage Commissioner which provided that:

"No licensee shall sell or possess, or allow, permit or suffer on or about the licensed premises, any malt, hops, oak shavings or chips, flavoring or coloring agents, cordial or liquor extracts, essences or syrups, or any ingredient, compound or preparation of similar nature."

The contention was that the rule went beyond the statute which made these things unlawful only when intended for improper use. The court rejected this argument saying:

"However, we are of the opinion that the defendant is not limited in his control over the conduct of licensees in any such way as is suggested by the prosecutor. By section 36 of the act * * * he is given broad power to promulgate rules and regulations concerning the conduct of the business. That such power may be delegated to such an officer by the legislature has been settled. *State Board of Milk Control v. Newark Milk Co.*, 118 *N. J. Eq.* 504. The liquor business is one peculiarly subject to strict governmental control. * * *
We think the defendant had ample power to make the regulation in question and furthermore that it is entirely reasonable and proper." (at 598)

In *Grant Lunch Corp. v. Driscoll*, 129 *N. J. L.* 408 (*Sup. Ct.* 1943), affirmed 130 *N. J. L.* 554 (*E. & A.* 1943), *certiorari* denied 320 *U. S.* 801, 64 *S. Ct.* 431, 88 *L. Ed.* 484 (1944), the licensee's employee "by mistake and not willfully" sold a bottle of rye whiskey at a price beneath the minimum consumer price in violation of Rule 6 of State Regulation No. 30 which prohibited the sale or offering for sale of any such product at a figure less than that agreed upon between the manufacturer or wholesaler and the licensed retailer. One of the attacks upon the validity of the rule was that it punished sales resulting from "innocent, non-negligent errors" and thus exceeded the statutory authority under which it was promulgated. The court upheld the rule saying:

"The offense charged against prosecutor was not a crime; it was a violation of rules and regulations duly set up under statutory

authority in the control of a business that for many years has been lawfully subjected to regulation by statute and under statutory authority. The sale of liquor has never been a business of right in this state. The legislature has uniformly granted wide discretion to officers charged with duties with respect to the granting and revoking of liquor licenses. The commissioner is empowered by the 1938 statute, *supra*, to make the regulations necessary, in his judgment, in order to secure a fair administration of the law permitting the sale of intoxicating liquor and the fixing of a price applicable alike to all dealers and all customers. It was within the authority of the State Commissioner of Alcoholic Beverage Control to impose the regulation under review and to suspend the license of a violating licensee, * * *. The right extensively to regulate the sale of intoxicating liquors by retail has been given broad judicial support, * * *. The prosecutor's argument presents no sound reason for distinguishing the foregoing decisions.

Although the sale was not accomplished in purposeful violation of the regulations it was such an act as would have been avoided had the prosecutor's clerks performed their duty; and in any event it was a flat violation of lawful regulations duly promulgated and fully grounded in the statute."

In *Essex Holding Corp. v. Hock,* 136 *N. J. L.* 28 (*Sup. Ct.* 1947), there was involved the validity of the Alcoholic Beverage Commissioner's Rule 1 of State Regulations No. 20 providing that

"No licensee shall sell, serve, deliver or allow, permit or suffer the service or delivery of any alcoholic beverage, directly or indirectly, to any person under the age of twenty-one (21) years or to any person actually or apparently intoxicated, or allow, permit or suffer the consumption of alcoholic beverages by any such person upon the licensed premises."

The licensee claimed that in order to be guilty of a violation of this rule there must be proof that it had knowledge of the facts complained of. In his opinion for the court Mr. Justice Wachenfeld held that knowledge was unnecessary and that the mere fact of a violation of the rule was sufficient:

"In construing this section consideration must be given to the legislative intent, and inquiry should be made to determine if it concluded to make the offense complete without guilty knowledge. The lawmakers may declare an act criminal irrespective of the knowledge or motive of the doer of such act and the court has no right to insert an element not intended by the Legislature. * * *

Although statutes penal in character must be construed strictly, the injunction of the Legislature as hereabove indicated enjoins us to the contrary in reference to liquor traffic. * * *
* * * The intent of the Legislature and the rules and regulations of the department governing enforcement clearly encompass the responsibility of the licensee for the consumption of alcoholic beverages by minors under the circumstances complained of.

Although the word 'suffer' may require a different interpretation in the case of a trespasser, it imposes responsibility on a licensee, regardless of knowledge, where there is a failure to prevent the prohibited conduct by those occupying the premises with his authority." (at 30–31)

As stated in *Hudson Bergen County Retail Liquor Stores Ass'n. v. Board of Com'rs. of City of Hoboken, supra,* 135 *N. J. L.* 502, 509, "the state authorities should be given every reasonable opportunity to work out the mandate of the legislature."

 The rule in question comes clearly within the delegated authority of the Director as a reasonable regulation in the field of alcoholic beverage control. The Director has the power to make the licensee responsible for the activities upon the licensed premises. In fact, it is difficult to see how the Division could properly maintain discipline in this field if in each case it had to show knowledge by the licensee of all the activities upon the premises. This would leave the door open to evasion of the Alcoholic Beverage Law and the many rules of the Director promulgated thereunder and would make the enforcement of the law an impossibility.

 4. The appellant also asserts that it was error to admit in evidence an affidavit signed by the appellant's bartender, who was present at the hearing and who could have been called as a witness. The contents of the affidavit had previously been testified to by the State's witnesses. At best the affidavit was merely corroborative of evidence already in the record. In a hearing before an administrative tribunal technical rules of evidence are not controlling and the erroneous admission of evidence in such a proceeding will not cause a reversal unless the evidence erroneously admitted formed the basis for the decision of the administrative tribunal, *Andricsak v. National Fireproofing Corp.,* 3 *N. J.* 466, 471

(1950). Such was not the case here; the affidavit of the bartender was merely corroborative of the State's witnesses. There is no reversible error discernible.

5. The appellant objects to the lack of a rule in the Division permitting a licensee to file a brief or present oral argument before the Director after the taking of testimony before the hearer on charges against him. We are told that such permission is granted on request and in fact was granted here. Proper administrative procedure requires that such rights and agency procedure generally should be the subject of agency regulations so that a licensee may know of his rights. The need for the publication of such regulations is clearly stated in the final report of the Attorney-General's Committee on Administrative Procedure (1941) which unanimously recognized that:

"An important and far-reaching defect in the field of administrative law has been a simple lack of adequate public information concerning its substance and procedure. * * * To all but a few specialists, such a situation leads to a feeling of frustration. Laymen and lawyers alike, accustomed to the traditional processes of legislation and adjudication, are baffled by a lack of published information to which they can turn when confronted with an administrative problem.

Such a state of affairs will at least partially explain a number of types of criticisms of the administrative process. Where necessary information must be secured through oral discussion or inquiry, it is natural that parties should complain of 'a government of men.' * * * Where the process of decision is not clearly outlined, charges of 'star-chamber proceedings' may be anticipated. Where the basic outlines of a fair hearing are not affirmatively set forth in procedural rules, parties are less likely to feel assured that opportunity for such a hearing is afforded." (p. 25)

The committee lists seven forms of vital administrative information: agency organization, statements of general policy, interpretations, substantive regulations, practice and procedure, forms, and instructions (pp. 26–28).

"These various sources of administrative information should be recognized. As far as practicable, agencies should be authorized and directed to make and issue, from time to time, such of them as are appropriate to the agency's functions. · In compiling information of

this sort, the private individual would be materially helped if each agency would take care that its information is constantly improved in form and completeness; kept current as far as possible; promptly published in the Federal Register as well as in pamphlet form; separated as to (a) agency organization, (b) procedure, and (c) substance, interpretation, or policy; and distinguished from statutory provisions with which it may be published." (at *p.* 28)

These recommendations have been incorporated in the Federal Administrative Procedure Act from which we quote these pertinent provisions:

Sec. 3. (a) Rules. "Every agency shall separately state and currently publish in the Federal Register * * *

(2) statements of the general course and method by which its functions are channeled and determined, including the nature and requirements of all formal or informal procedures available as well as forms and instructions as to the scope and contents of all papers, reports, or examinations." (5 *U. S. C. A., sec.* 1002)

The need for such information is no less in a state administrative agency that deals with as many people as does the Division of Alcoholic Beverage Control than it is in any of the federal administrative agencies. The appellant, however, is in no position to complain of the lack of such a rule, for leave was given to him to file a brief.

## III.

The crucial point in the pending appeal is whether the failure to supply the appellant with a copy of the hearer's secret report to the Director constitutes reversible error.

It was conceded at the oral argument in the Appellate Division as well as in this court that

"The hearer in fact files a report of his conclusions with the Director, although there is no official and public rule which requires it, and no notice of the submission of the report is given to the affected licensee." 28 *N. J. Super.* 280, 288 (1953).

It is argued in the brief of the respondent Director that his determination was made "upon the basis of his own inde-

pendent findings and not by a subordinate." This, however, is not saying that the hearer's report was not used by him in the process of deciding the case. Nowhere in the record before us is it stated that he failed to read and otherwise utilize the hearer's confidential report. Every inference is entirely to the contrary. The respondent's brief concedes that hearers' reports have been consistently used since the inception of the agency in 1933. Is it not inconceivable that the Director should have insisted on having hearer's reports for 21 years and yet not used them in preparing his decisions? Is it reasonable to suppose that they merely served the function speciously assigned to them in the respondent's brief:

"The hearer's report serves merely to save the Director the time-consuming effort involved in the mechanical task of dictating his decision. The report has neither official status nor binding force. While it normally accompanies the record submitted to the Director for decision, the preparation of the report, so far as its place in the determinative action of the Director is concerned, could well await the Director's determination made after examination of the complete record."

What possible purpose could the consistent submission of such reports for 21 years have served, but to furnish the Director a key to the facts and the law of each case?

But we are not left to the inferences to be drawn from our knowledge of human nature. The respondent's brief refers us to two articles "for analysis and comment on the hearing and adjudicative procedure employed by this agency, see *Vogel and Jacobs, Study of State Administrative Agencies in New Jersey,* 60–68 (1941); *Note, Division of Alcoholic Beverage Control,* 7 *Rutgers L. Rev.* 465, 471–473 (1953)," both of which the respondent adopts as reliable commentaries on the work of the agency. In the first of these articles, at *page 65,* we are told:

"Every case is carefully reviewed by the Commissioner, *who not only studies the report of the hearing officer* but also reads the entire record. While it was the policy of the first commissioner to

'decide' the case himself, *he often conferred with the hearer regarding the facts or the conduct of the hearing.*"

and in the second, at *page 472*:

"The hearer prepares a report based on presented evidence and testimony which has been transcribed by stenographers. The report contains *a digest of testimony, the hearer's findings as to facts and law, and usually a recommendation. The report is submitted to the Director who renders the decision after careful study.* The only serious criticism of this procedure is that a copy of the report is not served upon the parties and they thus have no opportunity to take exception or to file briefs." (Emphasis added).

Thus it appears affirmatively (1) that the hearer's report regularly contains a digest of the testimony, the hearer's findings as to facts and law, and usually a recommendation, and (2) that the Director not only uses the hearer's report in reaching his determination but under the first commissioner at least

"Often conferred with the hearer regarding the facts or the conduct of the hearing."

Nor do the Director's conclusions and order state that he failed to read the hearer's report. They merely say that he has examined and reexamined "the entire record" before him and that "on the basis of the full testimonial record" he finds the appellant guilty. The Director seems to distinguish between "the entire record" and "the testimonial record." The entire record may well have included the hearer's report. As against the long practice of the use of the hearers' reports by the Director in deciding cases, we have only the statements made at oral argument and in the brief above quoted that the hearer's report was merely a device "to save the Director the time-consuming effort involved in the mechanical task of writing his decision," and a similar assertion that all

"determinations are based upon the personal and complete reading and appraisal of the entire record by the Director, who reaches his independent determination uninfluenced by any considerations extraneous to such record."

This is language that deceives neither court nor counsel, for again the term record is ambiguous.

In any proceeding that is judicial in nature, whether in a court or in an administrative agency, the process of decision must be governed by the basic principle of the exclusiveness of the record. "Where a hearing is prescribed by statute, nothing must be taken into account by the administrative tribunal in arriving at its determination that has not been introduced in some manner into the record of the hearing." *Benjamin, Administrative Adjudication in New York,* 207 (1942). Unless this principle is observed, the right to a hearing itself becomes meaningless. Of what real worth is the right to present evidence and to argue its significance at a formal hearing, if the one who decides the case may stray at will from the record in reaching his decision? Or consult another's findings of fact, or conclusions of law, or recommendations or even hold conferences with him?

The principle of the exclusiveness of the record has been given a statutory basis in the federal field in section 7 (d) of the Administrative Procedure Act of 1946, 5 *U. S. C. A., sec.* 1006. "The transcript of testimony and exhibits," that section reads, "together with all papers and requests filed in the proceeding, shall constitute the exclusive record for decision * * *."

The federal act in this, as in so many other respects, was merely restating a principle that has been uniformly applied by the federal courts in the absence of legislation, *Ohio Bell Telephone Co. v. Public Utilities Commission,* 301 *U. S.* 292, 300, 57 *S. Ct.* 724, 81 *L. Ed.* 1093, 1099 (1937); *United States v. Abilene & Southern Ry. Co.,* 265 *U. S.* 274, 288, 44 *S. Ct.* 565, 68 *L. Ed.* 1016, 1023 (1924). The principle is well established as the law in New Jersey even though this State has not yet enacted a statute analogous to the Federal Administrative Procedure Act. Said Mr. Justice Heher for the court in 1949:

"The action taken cannot be made to rest upon undisclosed evidence or information *dehors* the record which the parties in interest

have had no opportunity to test for trustworthiness and explain or rebut." *Pennsylvania R. Co. v. New Jersey State Aviation Commission,* 2 *N. J.* 64, 72.

The principle of the exclusiveness of the record necessarily bars the use of the hearer's report (which it is conceded in the instant case was submitted to the respondent Director with the record without disclosure thereof to the appellant) as an aid in the administrative decision process unless it is made part of the record. As the noted *Benjamin Report on Administrative Adjudication in New York* puts it, "whatever actually plays a part in the decision should be known to the parties, and subject to being controverted" (at *p.* 208). The hearer's report obviously played a part in the decision in this case. For it to have played such a part without having been shown to the appellant clearly violates his right to have the decision based exclusively upon matters in the record, which are known to him and can consequently be controverted by him. The individual litigant is entitled to be apprised of the materials upon which the agency is acting. He has a right not only to refute but, what in a case like this is usually more important, to supplement, explain, and give different perspective to the hearer's view of the case.

The hearing, provided for by *R. S.* 33:1–31, has been given a particular form and character by the Legislature for the purpose of satisfying those whose interests may be involved that all relevant facts and considerations will be put fairly before the Director, so that he may arrive at a just decision. When the report giving the hearer's digest of the evidence and his findings and recommendations is turned over to the Director without coming to the attention of the licensee, doubt may well arise as to whether a true view of the facts has been conveyed to the Director's mind. The very purpose of the statute is that the hearing should be public, but how can it be said that the hearing is public when the report which summarizes it as to both law and facts and makes recommendations as to sanctions is private?

The hearer may have drawn some erroneous conclusion in his report, or he may even have made some factual blunders.

Such mistakes are not uncommon in both judicial and administrative proceedings; indeed, the whole process of judicial review in both fields is designed to guard against them. But if a party has no knowledge of the secret report or access to it, how is he to protect himself? An unjust decision may very likely be the result where no opportunity is given to those affected to call attention to such mistakes. That is why it is a fundamental principle of all adjudication, judicial and administrative alike, that the mind of the decider should not be swayed by materials which are not communicated to both parties and which they are not given an opportunity to controvert. In the instant case the hearer can be characterized as a "witness" giving his evidence to the judge behind the back of the appellant, who has no way of knowing what has been reported to the judge. Indeed, at one stage of the agency's history, if not now, it was the practice for the Commissioner to confer with the hearer regarding the facts or the conduct of the hearing. Such conduct not only constitutes a violation of the principle of the exclusiveness of the record in deciding controversies, but it shocks one's sense of fair play on which our fundamental concepts of procedure are based.

The principle of the exclusiveness of the record is too well established in American administrative law to admit of real dispute. It is, however, urged by the respondent that the United States Supreme Court has been "crystal clear" in settling the law in favor of his contention that there is no requirement that the hearer's report be submitted to the parties.

Two answers present themselves immediately to the claim of the respondent based upon the decisions of the United States Supreme Court: First, the law of this State need not necessarily be the same as that established by the federal courts. Unless a federal question is involved, a decision of the United States Supreme Court, while always entitled to great respect, is not necessarily of conclusive authority in any state. If a federal decision is found to be at variance with the rule of law enforced in this State, it need not be followed by our courts, *Ward v. Keenan*, 3 *N. J.*

298, 303 (1949). Second, the federal cases relied upon by respondent do not in fact support his contention that the hearer's report need not be submitted to the parties. His claim is based upon a fundamental misunderstanding of what the United States Supreme Court has said on this subject, especially in the celebrated *First* and *Second Morgan* cases.

The *First Morgan* case, *Morgan v. United States*, 298 *U. S.* 468, 56 *S. Ct.* 906, 80 *L. Ed.* 1288 (1936), is of primary importance in administrative law because of its holding on the role of the deciding officer in the administrative process. In the course of its decision, however, the court did deal briefly with the matter that concerns us here, namely, the report of the hearing officer. At the conclusion of the hearing in the *Morgan* case, the private parties made a request that the hearing officer prepare a tentative report, which should be subject to exceptions and oral argument. This request was denied. In upholding the denial Mr. Chief Justice Hughes stated,

"While it would have been good practice to have the examiner prepare a report and submit it to the Secretary [the deciding authority] and the parties, and to permit exceptions and arguments addressed to the points thus presented * * * we cannot say that that particular type of procedure was essential to the validity of the hearing." 298 *U. S.*, at *page* 478, 56 *S. Ct.*, at *page* 910.

And in the *Second Morgan* case, 304 *U. S.* 1, 58 *S. Ct.* 773, 82 *L. Ed.* 1129 (1938), which involved the same factual pattern, the Chief Justice reiterated this language, saying that

"while it was good practice—which we approved—to have the examiner, receiving the evidence in such a case, prepare a report as a basis for exceptions and argument, we could not say that that particular type of procedure was esseontial to the validity of the proceeding." 304 *U. S.*, at *page* 21, 58 *S. Ct.*, at *page* 777.

What the Supreme Court *held* in the two *Morgan* cases was that an administrative hearing officer did not have to make a report for the guidance of the agency head at the close of

the hearing. Nowhere in its opinions did the court imply, much less hold, that, *if such a report by a trial examiner or hearer were actually made*, it could be kept secret. On the contrary, the court, in the *Second Morgan* case, struck down agency action where it was based upon *ex parte* findings prepared for the agency head by the *prosecution* behind the backs of the private parties. "The requirements of fairness," said Chief Justice Hughes, "are not exhausted in the taking or consideration of evidence, but extend to the concluding parts of the procedure as well as to the beginning and intermediate steps." (304 *U. S.*, at *page 20*, 58 *S. Ct.*, at *page 777*.)

Nor does *N. L. R. B. v. Mackay Radio & T. Co.*, 304 *U. S.* 333, 58 *S. Ct.* 904, 82 *L. Ed.* 1381 (1938), strongly relied on by the respondent, really stand for anything more than the *Morgan* cases. There, too, the examiner did not prepare and file an intermediate report at the conclusion of the hearing. The court relied on its *Morgan* holding to sustain the board's procedure. But again the court held only that the intermediate report procedure need not be followed at all; it did not say that, if a report is made, it need not be disclosed to the parties. Similarly, see *Consolidated Edison Co. of New York v. N. L. R. B.*, 305 *U. S.* 197, 228, 59 *S. Ct.* 206, 83 *L. Ed.* 126, 139 (1938) ; *Public Service Corporation of New Jersey v. Securities and Exchange Comm.*, 129 *F. 2d* 899, 903 (*C. C. A.* 3 1942), *certiorari* denied 317 *U. S.* 691, 63 *S. Ct.* 266, 87 *L. Ed.* 553 (1942) ; *N. L. R. B. v. Hearst*, 102 *F. 2d* 658, 662 (*C. C. A.* 9 1939).

In the federal field the almost uniform administrative practice prior to the Administrative Procedure Act was for examiner's reports to be submitted to the parties. Only the Federal Power Commission and the Post Office have been cited as exceptions to this, *Davis, Administrative Law*, 314 (1951). The Federal Power Commission explained its refusal to serve the parties with copies of examiner's reports on the grounds that such reports bound neither the parties nor the Commission and its enabling act provided an adequate remedy through a petition for rehearing, *In the Matter of Hope Natural Gas Co.*, 2 *F. P. C.* 1043 (1941). This case, it should

be noted, does not deal at all with the question of whether the agency practice violates the principle of the exclusiveness of the record. And in the one case where the action of the Federal Power Commission in this respect appears to have been in issue, the court dismissed the point so cavalierly as to lead one to doubt whether it was seriously presented, *Hartford Electric Light Co. v. Federal Power Comm.*, 131 *F. 2d* 953, 966 (*C. C. A.* 2 1942), *certiorari* denied 319 *U. S.* 741, 63 *S. Ct.* 1028, 87 *L. Ed.* 1698 (1943)]

The only federal case in which the right of a party to have a hearing officer's report that had been made to his superior appears to have been denied directly is *Peoria Braumeister Co. v. Yellowley*, 123 *F. 2d* 637 (*C. C. A.* 7 1941). But the court there supported its bare assertion that the right to receive a copy of the report was not an essential ingredient of due process merely by quoting from the *First Morgan* case the passage already cited. As has been shown, the language of Chief Justice Hughes is relevant only on the question of whether the intermediate report procedure has to be followed at all. It does not hold that, if a report is made, it need not be shown to the parties. The court in the *Morgan* case was in no way condoning the practice of having administrative decisions based upon secret reports of hearing officers.

We have not been able to find a single case in any state of the Union, nor have any been cited to us, justifying or attempting to justify the use of secret reports by a hearer to the head of an administrative agency. To approve such a practice in deciding an administrative controversy would be to confer on New Jersey the dubious distinction of being the only jurisdiction in the United States to ignore a fundamental element of due process and fair play. So far as we know, it is only in England that the question of the right of the parties to disclosure of an administrative hearing officer's report which plays a part in the decision process has been considered by the highest court of the land and answered in the negative. In *Local Government Board v. Arlidge*, [1915] *A. C.* 120, the House of Lords, in a case involving the closing down of a dwelling house, expressly denied the right

of the private. party to see the report of the hearing officer (inspector) upon which the agency decision was based. Two points should, however, be made with regard to the *Arlidge* case. In the first place, the situation in England with regard to administrative procedure is different from that on this side of the Atlantic. The English courts cannot base their decisions in this field upon constitutional grounds, for, as is well known, there is in England no written constitution for the courts to enforce. The *Arlidge* case itself upheld the very type of vicarious decisional process which the United States Supreme Court so emphatically rejected in the *First Morgan* case, *supra*. As Chief Justice Hughes expressed it in that case, the *Arlidge* decision "is not deemed to be pertinent to a proceeding under the statute before us and to the hearing which is required by the principles established by our decisions," 298 *U. S.* 468, at *page* 482, 56 *S. Ct.* 906, at *page* 912, 80 *L. Ed.* 1288.

The holding of the *Arlidge* case on the question before us has been severely criticized in England. Strict adherence in the English courts to the doctrine of *stare decisis*, a doctrine fortunately not as rigidly followed here, has rendered impossible the overruling of the *Arlidge* case. In *London Street Tramways v. London County Council*, [1898] *A. D.* 375, the Lord Chancellor, the Earl of Halsbury, expounded the doctrine of the infallibility of the House of Lords, saying:

"My Lords, for my own part I am prepared to say that I adhere in terms to what has been said by Lord Campbell and assented to by Lord Wensleydale, Lord Cranworth, Lord Chelmsford and others, that a decision of this House once given upon a point of law is conclusive upon this House afterwards, and that it is impossible to raise that question again as if it was *res integra* and could be reargued, and so the House be asked to reverse its own decision. That is a principle which has been, I believe, without any real decision to the contrary, established now for some centuries, and I am therefore of opinion that in this case it is not competent for us to rehear and for counsel to reargue a question which has been recently decided. * * *

My Lords, it is totally impossible, as it appears to me, to disregard the whole current of authority upon this subject, and to suppose that what some people call an 'extraordinary case,' an 'unusual case,' a case somewhat different from the common, in the opinion

of each litigant in turn, is sufficient to justify the rehearing and rearguing before the final Court of Appeal of a question which has been already decided. * * *" (at 379–380)

A noted authority has remarked that as a result of this case "legislation is necessary to avoid the result of a bad decision of the House of Lords," *Hood Phillips, The Constitutional Law of Great Britain and the Commonwealth* (1952), at 467. See also *Denby & Sons v. Minister of Health*, [1936] 1 *K. B.* 337. Of especial significance in this respect are the conclusions of the Committee on Ministers' Powers which was appointed in 1929 by the Lord Chancellor to investigate the whole field of administrative law. That committee, conceded to be an exceptionally well balanced, representative body, with political views ranging from those of Sir William Holdsworth to those of Harold J. Laski, devoted much of its attention to the problem of disclosure of the hearing officer's reports. After careful consideration of the problem, the committee unanimously concluded in favor of the disclosure:

"To these various arguments for and against publication we have given prolonged consideration, and on balance have come to the conclusion that publication is right. By that we do not mean that the expense of printing a long report should in every case be incurred; but that in all cases the report of the inspector should be made available to the parties concerned and to the Press, and in important cases should be officially published by the Department responsible for the inquiry." (at 105)

even implying that nondisclosure in these circumstances was contrary to "natural justice":

"Some judges have discerned a fourth principle of natural justice, which other judges have declined to admit, *viz.*: that when Parliament has provided for what amounts to an oral hearing by the method of a 'public inquiry,' local or otherwise, held before an inspector appointed for the purpose by the Minister, as a means of guidance to the Minister in his decision—whether judicial or *quasi*-judicial—it is contrary to natural justice that the inspector's report upon the inquiry should not be made available to the parties so heard. Such an inquiry is plainly intended by Parliament to be the means by which all the main relevant facts are to be ascertained, and the main arguments of the parties affected are to be heard.

Those parties are justly entitled, it is said, to know what facts are found by the inspector and how he sums up the arguments he has heard, so that they may know what material is put before the Minister for his decision." (at 80)

An analysis of the American and English law on the subject fails to convince us that an exception should be made in this case to the basic principle of the exclusiveness of the record. In England, it is true, the highest court has held against disclosure of the hearer's report. But even apart from the fact that, as Chief Justice Hughes pointed out, *supra*, the *Arlidge* holding is not relevant in this country, the decision of the House of Lords has been so severely criticized by English jurists themselves that one wonders why we should follow it here. In this country the two lower federal court decisions which appear to support nondisclosure of the hearer's report are, as we have seen, based upon the same misunderstanding of what the United States Supreme Court has held on this subject that pervades the respondent's argument. The Supreme Court has never upheld the nondisclosure of an examiner's report. It has said only that such a report need not be made in the particular case there under consideration. One familiar with the opinion in the *Second Morgan* case must find it hard to believe that the court which delivered it could hold otherwise than for appellant in a case like the instant one. In the *Second Morgan* case agency action was reversed because it was based upon findings submitted *ex parte* to the agency head by officials of the *prosecution* branch of the agency. As Chief Justice Hughes observed:

"If in an equity cause, a special master or the trial judge permitted the plaintiff's attorney to formulate the findings upon the evidence, conferred *ex parte* with the plaintiff's attorney regarding them, and then adopted his proposals without affording an opportunity to his opponent to know their contents and present objections, there would be no hesitation in setting aside the report or decree as having been made without a fair hearing." 304 *U. S.*, at *page* 20, 58 *S. Ct.*, at *page* 777, 82 *L. Ed.* 1129.

The situation in the instant case may not be so extreme, but is not the principle of the exclusiveness of the record equally

violated where the hearer, an employee of the agency, is permitted to make an *ex parte* report (containing a digest of testimony, findings as to fact and law, and a recommendation) for the benefit of the administrative judge? Compare *Pennsylvania R. Co. v. New Jersey State Aviation Commission, supra*, 2 *N. J.* 64; *Family Finance Corp. v. Gough*, 10 *N. J. Super.* 13 (*App. Div.* 1950) (invalidating agency action where secret investigative reports played a part in decisional process).

It should be borne in mind that the danger of unfairness in this type of procedure is particularly great in an agency in which there is such a high degree of concentration of prosecuting and judicial functions in the one agency. In his concurring opinion in *In re Larsen*, 17 *N. J. Super.* 564, 574–575 (1952), Mr. Justice Brennan, while in the Appellate Division of the Superior Court, observed:

"Here the degree of concentration of functions in the Director himself is virtually complete. He is responsible for the direct supervision of every function of his agency * * * there is general agreement that there is substance in the fear that in such concentration inheres the danger of partiality in judgments having an impact upon private rights and that the danger cannot be ignored."

And this is still true despite recent attempts by the Division to ameliorate this objection; compare *Note, 7 Rutgers L. Rev.* 465, 471 (1953), with *Vogel and Jacobs, Study of State Administrative Agencies in New Jersey*, 75 (1941), showing that the basic concentration within the Division still remains. Where, as here, the final decision is rendered by one who did not hear the evidence but relies, in part at least, upon the findings and report of the hearing officer, there is an obvious danger that the decision may be based on findings set forth in the hearer's report that are not supported by the evidence. To guard against this danger and to accord the appellant the fair play to which he is entitled it is essential that prior to its submission to the deciding officer the hearer's report be made available to the parties and that they then be given an opportunity to correct any mistakes that may appear in the report. This simple requirement, while imposing no hard-

ship on the agency, does protect the individual against the strong possibility of a miscarriage of justice or the suspicion thereof.

The problems involved in the two *Morgan* cases have been dealt with in some detail in the Federal Administrative Procedure Act of 1946. Under it agency examiners may now make initial or recommended decisions with the latter taking the place of the pre-1946 intermediate reports. All such recommended decisions become a part of the record and must be submitted to the parties so that they can take exceptions thereto, 5 *U. S. C. A., sec.* 1007. This does not, of course, bear directly upon the question of whether the procedure in the instant case violates due process. It does, however, indicate the desire of Congress to maintain the disclosure of examiner's reports as the basic feature of the process of federal administrative decision. Without that feature the use of a hearer's report is like a performance of *Hamlet* without the Prince of Denmark. "It is a distinguishing feature of the examiner report procedure that the hearing officer's report is subjected, before the deciding body acts upon it, to exception and critical argument (oral and written) by the parties, calculated to correct whatever errors the report may contain. This is a feature of the greatest value not only in assuring a correct result but in satisfying the feelings of the parties." *Benjamin, supra,* 231. As Chief Justice Hughes put it in *Second Morgan* case, *supra,* 304 *U. S.,* at *page 22,* 58 *S. Ct.,* at *page 778,* 82 *L. Ed.* 1129 :

"The maintenance of proper standards on the part of administrative agencies in the performance of their *quasi*-judicial functions is of the highest importance and in no way cripples or embarrasses the exercise of their appropriate authority. On the contrary, it is in their manifest interest."

It is as much to the advantage of the Division as to private parties before it that the public have confidence in the fairness of its procedure. Whatever inconvenience the agency may suffer in modifying its practice (and one wonders how great it will really be) will be more than offset by the in-

creased trust which the public will have in the justness of
its procedure. In these cases, as Lord Hewart, C. J., has
aptly pointed out, "it is not merely of some importance but
is of fundamental importance that justice should not only
be done, but should manifestly and undoubtedly [be seen]
to be done." *Rex v. Sussex Justices,* [1924] 1 *K. B.* 256,
259. See *Schwartz, A Decade of Administrative Law*: 1942–
1951, 51 *Michigan L. Rev.* 775, at 827 (1953). Whether
the Director relies on the hearer's report or not, if he has
the report available to him and the individual litigant does
not, there is always the danger that the litigant will suspect
that the Director is using it in reaching his decision. This
is particularly true where the practice of making secret
hearers' reports is not only not mentioned in Division rules,
but the very standing of the hearer's report is denied in the
respondent's brief. At the risk of repetition we quote:

> "The Hearer's report serves merely to save the Director the time-
> consuming effort involved in the mechanical task of dictating his
> decision. *The report has neither official status nor binding force.*
> While it normally accompanies the record submitted to the Director
> for decision, the preparation of the report, so far as its place in
> the determinative action of the Director is concerned, could well
> await the Director's determination made after examination of the
> complete record." (Emphasis added)

and at the oral argument before the Appellate Division where
it was asserted that

> "there is no official and public rule which requires it." 28 *N. J.
> Super.* 280, 288, *supra.*

It is as important for an administrative officer as for a
judge not only that he be honest but that he be believed to
be honest.

The underlying rationale of the decisions we have been
discussing was excellently stated 40 years ago by Lord
Sumner, an eminent English judge:

> "If it was our function to advise the Local Government Board
> as to its procedure generally, or to criticise the procedure actually
> adopted as such, I should for my part suggest that the more open

the procedure the better. By all means let both the appellant and the local authority see the [inspector's] reports, * * *. By all means let the appellant, and the local authority, too, if it wishes, see and address the judge: it is all in his day's work. By all means let the appellant have the last word and as many of them in reason as he likes. Time spent in removing a grievance or in avoiding the sense of it is time well spent, and the Board's officials will, like good judges, amplify their jurisdiction by rooting it in the public confidence." *Rex v. Local Government Board*, [1914] 1 *K. B.* 160, 203–204.

The only statutory provision as to the hearing that must be afforded a licensee before his license can be suspended or revoked, is to be found in *R. S.* 33:1–31:

"No suspension or revocation of any license shall be made until a five-day notice of the charges preferred against the licensee shall have been given to him personally or by mailing the same by registered mail addressed to him at the licensed premises and *a reasonable opportunity to be heard thereon afforded to him.*" (Emphasis supplied)

The italicized language is most important to the licensee, for without it it might well be contended that as a licensee he was not entitled by law to any hearing at all, *Davis, Administrative Law*, 250 (1951). But the quoted language clearly was inserted in the statute to give him not such a hearing as might suit the Director's fancy but one which carried with it "the elemental due process requirement that the hearing be fairly conducted." This, as we have seen from the cases in every court of last resort except the British House of Lords, has been held to preclude the submission by a hearer to the deciding authority of secret reports containing findings of fact, conclusions of law and recommendations for the disposition of the case.

The judgment of the Appellate Division of the Superior Court is reversed with instructions to remand the matter to the Division of Alcoholic Beverage Control with directions to proceed in accordance with the opinion of this Court.

HEHER, J. (concurring). Rule 31 of the department, considered in Part II, paragraph 3 of the opinion of the

Chief Justice, is all embracive in its terms and scope, no matter what the nature of the conduct made the subject of disciplinary action; and I would reserve for fuller argument the question of whether the regulation, so read, has statutory sanction and in all such cases satisfies the test of "a reasonable presumption."

Otherwise, I concur in the reasoning and conclusions of the Chief Justice.

JACOBS, J., with whom BURLING, J., agrees (dissenting). In the proper discharge of our function of judicial review we should examine the proceedings with full recognition that the Division of Alcoholic Beverage Control is part of a coordinate branch of government and that its administrator has the same capacity for the wholesome administration of justice in his lawful sphere as judges have in theirs. Thus viewed, the record leaves little room for doubt that the appellant was fairly charged, tried and found guilty on the basis of compelling evidence, and that his liquor license was justly suspended in strict compliance with all statutory and constitutional requirements.

The appellant-licensee operates a barroom and hotel on the Paterson Plank Road in East Rutherford. Following the receipt of a complaint, investigators of the Division of Alcoholic Beverage Control visited the licensed premises to ascertain whether rooms were being rented for immoral purposes. They conducted their investigation and took statements in the licensee's presence from the bartender Charles Bauer, the night bartender Frank Gentile and the waiter Eugene Forzani. Thereafter the Division charged the licensee with (1) having permitted and suffered lewdness and immoral activities upon his licensed premises, "*viz.*, the renting of rooms for the purpose of illicit sexual intercourse; in violation of Rule 5 of State Regulations No. 20," and (2) having permitted and suffered the sale of contraceptives in the licensed premises in violation of Rule 9 of State Regulations No. 20. Hearing pursuant to the charges was duly held, the licensee appeared with counsel and participated

fully in the hearing, and all of the testimony was taken stenographically and transcribed. Three investigators testified fully and directly in support of the charges, and Bauer's statement, acknowledging in detail the truth of the first charge, was introduced in evidence. The licensee testified on his own behalf and stated that he knew nothing about his employees having rented any rooms for immoral purposes or having sold contraceptives. Forzani testified that he had rented rooms to the investigators, had given contraceptives to one of them and had received $1 in addition to the price charged for the rooms; he denied any knowledge as to the purported use of the rooms. Gentile testified that Forzani had given him the money received from the investigators for the rooms and that he had placed it in the cash register; he likewise denied any knowledge as to the purported use of the rooms. Bauer attended the hearing but was not called by the licensee to testify.

The hearing was conducted before Clarence E. Kremer, an attorney-at-law employed by the Division as a hearer, and at its close he stated that the matter would be submitted to the Director for determination. Counsel for the licensee voiced no objection; thereafter he requested and received permission to file a brief with the Director and he did so on November 24, 1952. In his brief he advanced the contention that there was "only the uncorroborated testimony of the department's own employees, contradicted by the testimony of the licensee's witnesses" and that the question of credibility must be "resolved by the Director against his own employees in favor of the licensee." Although the record does not so indicate it may safely be assumed that the hearer presented to the Director, in some form or other, his analysis of the testimony and his recommendation. However, no request was ever made on the licensee's behalf to examine the hearer's analysis and recommendation and, in any event, the Director did not rely upon them. The record may be searched in vain for any suggestion to the contrary and the Director's opinion states unequivocally that he had "examined and reexamined the entire record" before him and that,

having done so he was "thoroughly convinced that a careful reading of the testimony and evidence could lead any dispassionate, discerning person to but one conclusion, namely, that the testimony of the Division's agent truthfully represents the facts in all material and probative respects." Further on, he states that "on the basis of the full testimonial record, revealingly corroborated by all of the attendant circumstances, I am convinced that the violations were committed as charged herein." There is no contention advanced by the licensee that the Director did not personally study all of the testimony and evidence as he says he did. *Cf. Willapoint Oysters v. Ewing*, 174 *F*. 2d 676, 696 (*C. C. A.* 9 1949), *certiorari* denied, 338 *U. S.* 860, 70 *S. Ct.* 101, 94 *L. Ed.* 527 (1949), rehearing denied, 339 *U. S.* 945, 70 *S. Ct.* 793, 94 *L. Ed.* 1360 (1950), where the Court of Appeals for the Ninth Circuit said: "We cannot allow the Administrator's recitation that he has personally examined and considered the evidence in making his decision to be successfully challenged by a mere allegation in a brief. We have neither moral nor legal right to presume that only those who occupy judicial office respect their obligations and perform their official duties honestly, sincerely and conscientiously." When the Appellate Division reviewed the record it found that "ample proof was presented to support the determination that the licensee's employees freely and brazenly rented rooms to the Division's agents for the ostensible purpose of enabling them to engage in illicit sexual intercourse; and further, that one of the employees sold them contraceptives to be used in connection therewith." See *Mazza v. Cavicchia*, 28 *N. J. Super.* 280, 284 (*App. Div.* 1953).

Although several proposed Acts have been introduced in the Senate and General Assembly, our Legislature has thus far deliberately refrained from adopting any general enactment comparable to the Federal Administrative Procedure Act. 5 *U. S. C. A.*, § 1001 *et seq.* Consequently the Director remains governed by *R. S.* 33:1–31 which simply provides that the licensee shall have reasonable opportunity to be heard on the charges against him, and the elemental due

process requirement that the hearing be fairly conducted. In the instant matter the licensee had ample opportunity to be heard and there is no substantial basis for the suggestion that the hearing was not fairly conducted. Indeed, the Director's procedure did not materially differ from that followed by áppellate judges whose law clerks prepare preliminary memoranda often embodying analyses of the testimony and their views. And it was similar to that followed by his predecessors in thousands of cases covering over two decades; it is significant that until today the many courts which reviewed similar license suspensions by Commissioners Burnett, Driscoll and Hock did not in any instance suggest that their procedure infringed upon constitutional rights of liquor licensees. See *Greenbrier, Inc. v. Hock*, 14 *N. J. Super.* 39, 42 (*App. Div.* 1951), certification denied 7 *N. J.* 581 (1951); *In re Gulman*, 21 *N. J. Super.* 579 (*App. Div.* 1952); *In re Larsen*, 17 *N. J. Super.* 564 (*App. Div.* 1952); *In re Schneider*, 12 *N. J. Super.* 449 (*App. Div.* 1951); *Traymore of Atlantic City, Inc. v. Hock*, 9 *N. J. Super.* 47 (*App. Div.* 1950); *The Panda v. Driscoll*, 135 *N. J. L.* 164 (*E. & A.* 1946); *Kravis v. Hock*, 137 *N. J. L.* 252 (*Sup. Ct.* 1948); *Essex Holding Corp. v. Hock*, 136 *N. J. L.* 28 (*Sup. Ct.* 1947); *Cedar Restaurant & Cafe Co. v. Hock*, 135 *N. J. L.* 156 (*Sup. Ct.* 1947); *Grant Lunch Corp. v. Driscoll*, 129 *N. J. L.* 408 (*Sup. Ct.* 1943), affirmed 130 *N. J. L.* 554 (*E. & A.* 1943), *certiorari* denied 320 *U. S.* 801, 64 *S. Ct.* 431, 88 *L. Ed.* 484 (1944); *Gaine v. Burnett*, 122 *N. J. L.* 39 (*Sup. Ct.* 1939), affirmed 123 *N. J. L.* 317 (*E. & A.* 1939).

Although the majority have dealt at length with them, we are in nowise concerned here with instances in which administrative officials have gone beyond the evidence in the strict record for their decisions. See *Pennsylvania R. Co. v. New Jersey State Aviation Comm.*, 2 *N. J.* 64, 72 (1949); *In re Plainfield-Union Water Co.*, 11 *N. J.* 382 (1953); *Id.*, 14 *N. J.* 296 (1954); *Family Finance Corp. v. Gough*, 10 *N. J. Super.* 13, 25 (*App. Div.* 1950). We are concerned here only with an instance in which the administrative offi-

cial, after exhaustive examination thereof, has determined the matter on the evidence in the strict record properly before him and now presented to us for judicial review; in this situation the pertinent authorities clearly recognize that the presence of a subordinate's factual analysis and recommendation does not impair the constitutional validity of the proceedings and determination. Thus, in the first *Morgan* case (*Morgan v. United States*, 298 *U. S.* 468, 56 *S. Ct.* 906, 912, 80 *L. Ed.* 1288 (1936)) Chief Justice Hughes took pains to point out that evidence may be taken by an examiner and "may be sifted and analyzed by competent subordinates." *Cf. Morgan v. United States*, 304 *U. S.* 1, 25, 58 *S. Ct.* 773, 82 *L. Ed.* 1129, 1136 (1938); *National Labor Relations Board v. Mackay Radio & T. Co.*, 304 *U. S.* 333, 350, 58 *S. Ct.* 904, 82 *L. Ed.* 1381, 1392 (1938); *Horsman Dolls, Inc. v. State Unemployment, etc., Comm.*, 134 *N. J. L.* 77, 81 (*E. & A.* 1946), appeal dismissed 329 *U. S.* 693, 67 *S. Ct.* 635, 91 *L. Ed.* 606 (1947). And in the fourth *Morgan* case (*United States v. Morgan*, 313 *U. S.* 409, 61 *S. Ct.* 999, 1004, 85 *L. Ed.* 1429 (1941)), the Supreme Court, through Justice Frankfurter, had this to say as to the interrogation of an administrative official with respect to the extent of his discussion with his subordinates:

"Over the Government's objection the district court authorized the market agencies to take the deposition of the Secretary. The Secretary thereupon appeared in person at the trial. He was questioned at length regarding the process by which he reached the conclusions of his order, including the manner and extent of his study of the record and his consultation with subordinates. His testimony shows that he dealt with the enormous record in a manner not unlike the practice of judges in similar situations, and that he held various conferences with the examiner who heard the evidence. Much was made of his disregard of a memorandum from one of his officials who, on reading the proposed order, urged considerations favorable to the market agencies. But the short of the business is that the Secretary should never have been subjected to this examination. The proceeding before the Secretary 'has a quality resembling that of a judicial proceeding.' *Morgan v. United States*, 298 *U. S.* 468, 480, 56 *S. Ct.* 906, 911, 80 *L. Ed.* 1288 [1294]. Such an examination of a judge would be destructive of judicial responsibility. We have explicitly held in this very litigation that 'it was

not the function of the court to probe the mental processes of the Secretary.' 304 *U. S.* 1, 18, 58 *S. Ct.* 773, 776 [999], 82 *L. Ed.* 1129 [1132]. Just as a judge cannot be subjected to such a scrutiny, compare *Fayerweather v. Ritch*, 195 *U. S.* 276, 306, 307, 25 *S. Ct.* 58, 67, 49 *L. Ed.* 193 [213, 214], so the integrity of the administrative process must be equally respected. See *Chicago, B. & Q. R. Co. v. Babcock*, 204 *U. S.* 585, 593, 27 *S. Ct.* 326, 327, 51 *L. Ed.* 636 [638]. It will bear repeating that although the administrative process has had a different development and pursues somewhat different ways from those of courts, they are to be deemed collaborative instrumentalities of justice and the appropriate independence of each should be respected by the other. *United States v. Morgan*, 307 *U. S.* 183, 191, 59 *S. Ct.* 795, 799, 83 *L. Ed.* 1211 [1217]."

*Cf. Bethlehem Steel Co. v. National Labor R. Board, 74 App. D. C. 52, 120 F. 2d 641, 653 (App. D. C. 1941),* where Justice Edgerton said:

"Petitioners complain of the extent to which the Board availed itself of the services of subordinates in the process of considering the case and reaching a conclusion. The petition alleges that the Board 'did not judically consider, weigh or appraise the evidence' in making its decision, but relied upon conclusions of fact and law made by subordinates, and that petitioners were given no opportunity to inspect or argue against these conclusions. The Board's answer neither admits nor denies these allegations, on the ground that they are irrelevant and beyond the scope of judicial inquiry. Petitioners' contention was presented in the same way, and rejected, in *Bethlehem Shipbuilding Corp., Limited, v. National Labor Relations Board* [1 *Cir.*, 114 *F. 2d* 930]. There are other cases to like effect. The Act requires only a hearing, before the Board or an agent designated by the Board, and findings by the Board which are supported by evidence. It is not the function of a court to 'probe the mental processes' of an administrative officer 'in reaching his conclusions if he gave the hearing which the law required.' "

In *Peoria Braumeister Co. v. Yellowley,* 123 *F. 2d* 637, 639 (*C. C. A.* 7 1941), the court, in an opinion delivered by Supreme Court Justice Minton (then Circuit Court judge), summarily rejected the contention that the failure to furnish a copy of the examiner's report in a liquor license suspension proceeding, rendered the proceeding unfair under the due process clause; and the holding of the Second Circuit in *Hartford Electric Light Co. v. Federal Power Comm.,* 131 *F. 2d* 953, 966 (*C. C. A.* 2 1942), *certiorari* denied 319 *U. S.*

741, 63 *S. Ct.* 1028, 87 *L. Ed.* 1698 (1943), was to the same effect. In the latter case the court noted that "So far as appears from its findings and legal conclusions, the Commission did not rely upon any such report, nor is it required to do so by the Act. We see no reason why, in the circumstances, that report, if there be one, should be considered by us." *Cf. Berg v. Industrial Commission,* 236 *Wis.* 172, 294 *N. W.* 506, 510 (*Sup. Ct.* 1940) ; *American Toll Bridge Co. v. Railroad Commission,* 12 *Cal.* 2d 184, 207, 83 *P.* 2d 1, 12 (*Sup. Ct.* 1938), affirmed 307 *U. S.* 486, 59 *S. Ct.* 948, 83 *L. Ed.* 1414 (1939). In the Appellate Division (*Mazza v. Cavicchia, supra,* 28 *N. J. Super.,* at *page* 287) Judge Francis aptly pointed out that "the courts have declared that so long as the one who has the ultimate burden of decision, in fact makes his own independent study of the record and in fact makes the determination of the issue involved, a fair hearing in the sense of due process has been granted. *Horsman Dolls, Inc. v. State Unemployment Compensation Commission, supra; In re Gutman, supra,* 21 *N. J. Super.,* at *page* 581; *In re Larsen,* 17 *N. J. Super* 564 (*App. Div.* 1952) ; *In re 17 Club, Inc., supra,* 26 *N. J. Super.* [43], at *page* 48; 42 *Am. Jur., Public Administrative Law,* § 141, *p.* 484; *Gellhorn, Administrative Law, p.* 739 (1940)." *Cf. Leeds v. Gray,* 109 *Cal. App.* 2d 874, 242 *P.* 2d 48, 54 (*D. C. App.* 1952) :

"Petitioner, of course, was entitled to a fair and full hearing. The fact that a fact finding tribunal does not see or hear the witnesses does not in every instance constitute a denial of such hearing. For example, many court proceedings are determined upon affidavits. There the court neither sees nor hears the witnesses. A fair and full hearing is given where the fact finder fully reviews the record and an opportunity is given the parties to argue their contentions as to the credibility of the witnesses and the other matters involved in the proceeding. This was done in our case by briefs. It is true that no proposed findings or decision were submitted to the parties and no opportunity given to argue concerning them, but where the board itself is passing on the record, fully considers it and the arguments presented, on the merits, there is no requirement that the board permit further argument on its proposed findings and decision, and no logical reason therefor."

It would seem that the majority have mistakenly dealt with the instant proceeding as one in which the Director went beyond the strict record. Even in that situation, however, this court recently held that the administrative determination will not be upset in the absence of a showing of prejudice. *Pennsylvania Railroad Co. v. Department of Public Utilities*, 14 *N. J.* 411, 428 (1954). See in accord: *Market Street Ry. Co. v. Railroad Comm. of Cal.*, 324 *U. S.* 548, 65 *S. Ct.* 770, 89 *L. Ed.* 1171 (1945); *United States v. Pierce Auto Freight Lines*, 327 *U. S.* 515, 66 *S. Ct.* 687, 90 *L. Ed.* 821 (1946). In criminal cases where the defendant's life or liberty was at stake this court has repeatedly sustained convictions, though there was error below, upon a finding of no prejudice. See *State v. LeFante*, 14 *N. J.* 584 (1954); *State v. Witte*, 13 *N. J.* 598 (1953); *State v. Vaszorich*, 13 *N. J.* 99 (1953), *certiorari* denied 346 *U. S.* 900, 74 *S. Ct.* 219, 98 *L. Ed.* —— (1953). How may it fairly act otherwise in a case which does not involve life and liberty, or even property, but a liquor license privilege over which the Legislature has practically unlimited control? See *In re Schneider, supra*, at *page* 456. It is well recognized that in view of the peculiar nature of the liquor traffic, licensees, as such, must be and are held legally responsible for the wrongful acts of their employees. See *Grant Lunch Corp. v. Driscoll, supra; Essex Holding Corp. v. Hock, supra; Greenbrier, Inc. v. Hock, supra.* In the instant matter the wrongful acts by the employees were established not only by the overwhelming testimony of the investigators but also by the testimony and statements of the employees themselves. The delivery of the contraceptives was testified to by the waiter Forzani; and the bartender Bauer's written statement, which the licensee did not call upon him to deny, acknowledged the first charge in detail. Under the circumstances, how could there have been a finding by the Director other than guilty, regardless of the hearer's analysis and recommendation? When the proceeding was before the Appellate Division it had power to review the facts and make independent findings (*R. R.* 4:88–13); it found that there was ample proof that rooms had

"freely and brazenly" been rented for ostensibly immoral purposes and that contraceptives had been sold. This court likewise has power to review the facts and make independent findings (*R. R.* 1:5–3); it would seem beyond belief that its factual conclusions would differ from those of the Director and the Appellate Division. Under the circumstances, the setting aside of the licensee's suspension disregards the essential justice of the proceeding and the important public interests involved, and tends to impose upon the Director, though the legislature has declined to do so, rigid judicial notions as to the precise form of procedural routine to be followed by him. See *Federal Communications Comm. v. Pottsville Broadcasting Co.,* 309 *U. S.* 134, 142, 60 *S. Ct.* 437, 84 *L. Ed.* 656, 661 (1940). *Cf. Feller, Administrative Procedure and the Public Interest,* 25 *Wash. U. L. Q.* 308, 315 (1940): "the attempt to read the procedural predilections of judges into the due process clause is as much to be condemned as the similar attempt to read economic predilections into the same constitutional provision." See also *Stone, The Common Law in the United States,* 50 *Harv. L. Rev.* 4, 17–19 (1936).

There was a time long ago when control over liquor licensees was vested in our courts. See *Gaine v. Burnett,* 122 *N. J. L.* 39 (*Sup. Ct.* 1939), affirmed 123 *N. J. L.* 317 (*E. & A.* 1939). And even as late as 1933 when the Department of Alcoholic Beverage Control was established there was still a legislative provision which vested in the judges of the Court of Common Pleas control over liquor licensees in certain counties. See *R. S.* 33:1–21, repealed by *L.* 1942, c. 159. Today, no one any longer questions the soundness of the legislative approach which placed in an administrative agency, rather than in the courts, broad and comprehensive power over the liquor traffic with its inherent dangers and abuses. Repeated criticisms have, nevertheless, been voiced with respect to particular phases of the administrative process as exemplified in the Division of Alcoholic Beverage Control and in other agencies. The most persistent criticism has been addressed to the continued legislative policy of concentrating, in a single administrator, wide powers of investigation, prose-

cution, hearing and determination. In 1938 I had occasion to recommend corrective legislative measures (see *Jacobs and Davis, A Report on the State Administrative Agency in New Jersey* (1938)) and thereafter the recommendation was repeated. See *Vogel, Study of State Administrative Agencies in New Jersey* (1941). In 1948 a comprehensive administrative procedure act was introduced in our Legislature but failed of passage. See *Schnitzer, The New Practice, p. 231, n. 22* (1949). This act provided for the establishment of an independent corps of hearers who would not be subordinate to the heads of the administrative agencies and whose determinations would be final except upon the prescribed administrative or judicial review; there are those who believe that without a corps of independent hearers, or a comparable substantive device, the basic problem will not be met despite such procedural gloss as may be imposed from time to time. *Cf.* Brennan, J., concurring in *In re Larsen, supra,* 17 *N. J. Super.* 564, at *page* 576. Several later acts containing provisions relating to administrative hearings were introduced in our Legislature but likewise failed of passage. The latest draft act was recently approved by a committee of the State Bar Association and was fully discussed at its last meeting. See 77 *N. J. L. J.* 133, 144 (1954). See also 77 *N. J. L. J.* 164 (1954). The social forces in favor of a state act embodying provisions comparable to those contained in the Federal Administrative Procedure Act are evident and such enactment would undoubtedly receive sympathetic application by the courts. *Cf. Wong Yang Sung v. McGrath,* 339 *U. S.* 33. 40, 70 *S. Ct.* 445, 94 *L. Ed.* 616, 624 (1949). The undisputed fact, however, is that thus far the Legislature has declined to adopt such provisions and, in recognition of basic principles of separation of power, courts should be very hesitant in asserting any judicial right to do so in the form of newly declared constitutional requirements. *Cf. State v. Monahan,* 15 *N. J.* 34, 46 (1954), where reference was made to the familiar, though often unheeded, caution by Justice Holmes that "it must be remembered that legislatures are ultimate guardians of the liberties and welfare of the people

in quite as great a degree as the courts." *Missouri, Kansas & Texas Ry. Co. of Texas v. May,* 194 *U. S.* 267, 270, 24 *S. Ct.* 638, 639, 48 *L. Ed.* 971, 973 (1904).

I would affirm the judgment entered in the Appellate Division.

*For reversal*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT and BRENNAN—4.

*For affirmance*—Justices BURLING and JACOBS—2.