**WBD OIL & GAS COMPANY and WBD Oil & Gas Company, Inc., Appellants,**

v.

**RAILROAD COMMISSION OF TEXAS; Dan Morales in his Official Capacity as Attorney General of the State of Texas; Anadarko Petroleum Corp.; MidCon Gas Services Corp.; Natural Gas Pipeline Company of America; Midgard Energy Company; and Conoco Inc., Appellees.**

No. 03–97–00002–CV

Court of Appeals of Texas, Austin.

Feb. 4, 1999.

Rehearing Overruled Jan. 19, 2001.

Opinion Concurring in Overruling of Rehearing Jan. 19, 2001.

Dissenting Opinion Jan. 19, 2001.

James Douglas Ray [signed], Michael P. Marcin [signed], Charles E. Hampton [signed], Gammage, Hampton, Marcin & Ray, P.L.C.C., Austin, for Appellants.

Philip F. Patman [signed], Patman & Osborn, Austin, for Appellee Anadarko.

John G. Soule [signed], Scott, Douglass, Luton & McConnico, L.L.P., Austin, for Appellee Midgard.

John Cornyn, Atty. Gen., Don Walker [signed], Asst. Atty. Gen., Administrative Law Division, Austin, for Appellee Railroad Commission.

Before Justices JONES, KIDD and POWERS.*

* Before John Powers, Senior Justice (retired), Third Court of Appeals, sitting by assignment.

J. WOODFIN JONES, Justice.

WBD Oil & Gas Company and WBD Oil & Gas Company, Inc. (collectively "WBD") filed a declaratory judgment action challenging the validity of field rules promulgated by the Railroad Commission of Texas ("Commission") for oil and gas fields in the Texas panhandle.[1] The trial court dismissed the suit for want of jurisdiction. In a single point of error, WBD asserts several bases for jurisdiction in a Travis County district court. We will reverse the trial court's order of dismissal.

## FACTUAL AND PROCEDURAL BACKGROUND

In an effort to settle confusion that existed in producing the enormous oil and gas fields of the Texas panhandle, the Commission issued notice in January 1986 of its intent to conduct hearings for the purpose of considering the consolidation of those 13 fields into a single "Panhandle Field" and, if consolidation was ordered, the adoption of rules for the consolidated field. The notice stated in pertinent part:

### I

NOTICE IS HEREBY GIVEN to the public and all interested persons that . . . the Railroad Commission of Texas will hold a hearing on a date and place to be determined.

### II

. . . .

[T]he Commission will consider consolidating all the Panhandle Fields into one, the proposed "Texas Panhandle Field," and prorating this consolidated new field as an associated reservoir.

*See* Tex. Gov't Code Ann. § 74.003(b) (West 1998).

1. The Defendants in the trial court below were the Railroad Commission of Texas and Dan Morales in his Official Capacity as Attorney General of the State of Texas. The following parties intervened, aligned with the

Operators are urged to present data and opinions as to whether the Panhandle Lime, Granite Wash, and various other formations are a common reservoir. . . .

If the Panhandle Fields are consolidated into one field, the Commission will also consider determining special field rules for regulating exploration, production, and development in a manner necessary to prevent waste, promote conservation, and protect correlative rights. Operators are urged to present data and opinions in support of the special field rules they would consider to be appropriate.

. . . .

### V

The Commission will consider adopting the following rules to govern the development and production of all wells prorated in the *proposed* Texas Panhandle Field, but will adopt rules as the evidence shows is necessary to prevent waste and protect correlative rights:

. . . .

### VI

Parties attending this hearing may propose other rules and/or alternative field rules and should submit evidence to support any proposed rule as it relates to waste prevention, oil and gas conservation, and the protection of correlative rights.

. . . .

### XII

All persons who intend to participate in the hearing of this docket are directed to file with Docket Services by February

Railroad Commission: Anadarko Petroleum Corp.; MidCon Gas Services Corp.; Natural Gas Pipeline Company of America; Midgard Energy Company; Conoco Inc. For convenience, we refer to these parties collectively as the "Commission."

4, 1986, a written Pleading setting forth the following:

1. Their correct name and mailing address;
2. Their intent to appear;
3. Whether or not party status will be requested;
4. The basis for standing if party status is requested;
5. Their position on the issued [sic] raised in this Notice and specifically with regard to consolidation of fields and special field rules;
6. Whether or not they intend to present evidence at the hearing; and,
7. Any other matter that is appropriate.

The first matter to be considered at the prehearing conference will be the designation of parties. Parties will be named at the prehearing conference....

An official Service List will be compiled and maintained by the Examiners. The Service List will contain only named parties (or their representatives) to the hearing. A list of interested persons who do not request party status but who request to be included for Commission generated mailings regarding this docket will also be compiled and maintained by the Examiners. The Service List will be updated as necessary and representatives may be designated to receive service for more than one party. Only the parties and representative [sic] included in the latest Service List must be served as required by Commission Rules or the procedure directed for this docket.

WBD received this notice, but did not accept the Commission's invitation to participate in the proceeding. At that time there were more than 15,000 producing oil or gas wells in the 13 fields located in the Texas

panhandle. WBD owned or operated forty such wells.

Pursuant to the notice, the Commission conducted an evidentiary, trial-type hearing commencing on January 6, 1987. The result of this hearing was the issuance in 1989 of an order that contained findings of fact, conclusions of law, field rules for oil, field rules for gas, general rules, and guidelines for compliance (collectively, the "Panhandle Field[2] rules"). The Commission's order was styled "Amended Final Order Adopting and Clarifying Rules and Regulations for [13 named oil and gas fields], Hereinafter Referred to as the 'Panhandle Fields'" and stated in pertinent part:

It has come to the Commission's attention that confusion exists among some operators in the Panhandle Fields as to the applicability of the rules presently enforced by the Commission in the administration of oil and gas conservation matters in said fields, and more particularly in the methods of completion permitted for oil wells. So that the existing confusion may be eliminated, the Commission, after review and due consideration of a Proposal For Decision in Docket No. 10–87,017, and the exceptions and replies thereto, hereby adopts the following findings of fact and conclusions of law:

### FINDINGS OF FACT

\* \* \*

5. The Railroad Commission called this hearing to review existing rules and to consider adopting new or amended rules for [13 named oil and gas fields]. These fields collectively are referred to as the Panhandle Fields.

### CONCLUSIONS OF LAW

\* \* \*

10. Changes and clarifications of rules in the Panhandle Fields are appro-

**2.** Although the Commission apparently did not actually consolidate all of the oil and gas fields in the Texas panhandle into a single field, we will, for convenience, refer to these fields collectively as the "Panhandle Field."

priate in light of "changed conditions", *Railroad Commission v. Aluminum Company of America*, 380 S.W.2d 599 (Tex.1964).

\* \* \*

Therefore, IT IS ORDERED by the Railroad Commission of Texas that the historic classification and separation of Panhandle oil and Panhandle gas fields shall be retained ... and that the following rules, in addition to such of the Commission's general rules and regulations as are not in conflict herewith, be and the same are hereby clarified and adopted to govern the drilling, completion and operation of wells in the Panhandle Fields:

*Oil Field Rules*
\* \* \*

*Gas Field Rules*
\* \* \*

*General Rules*

. . . .

Existing and future oil wells meeting one of the oil well criteria set forth in Appendix One will be presumed to have been properly completed. Operators shall have a period of one year to bring existing wells into compliance with an Appendix One guideline in order to receive the presumption.

. . . .

Existing gas wells will be presumed to have been properly completed if they meet one of the gas well completion criteria set forth in Appendix One to the Final Order in this docket. Operators shall have a period of one year to bring existing wells into compliance with an Appendix One guideline in order to receive the presumption.

. . . .

An operator with well(s) which fail to meet any of the completion guidelines may file an application for hearing that an exception to the field rules is necessary to prevent waste or protect correlative rights.

After being sued in 1994 for allegedly violating certain Commission rules, including portions of the 1989 Panhandle Field rules, WBD filed the present lawsuit to determine the validity and applicability of the Panhandle Field rules. In its petition, WBD sought declaratory relief that the rules violate various state and federal statutes and constitutional provisions, including prohibitions against retroactive laws (U.S. Const. art. I, § 10; Tex. Const. art. I, § 16), prohibitions against contradicting or suspending law in place at the time the field rules were promulgated (Tex. Const. art. I, § 28; Tex. Gov't Code Ann. § 481.141–143 (West 1990)), due process and due course of law clauses (U.S. Const. amend. XIV; Tex. Const. art. I, § 19), and separation of powers provisions (Tex. Const. art. II, § 1). The petition also alleged that the rules denied WBD's constitutional right to equal protection under the law (U.S. Const. amend. XIV; Tex. Const. art. I, § 3), that enforcement of these rules against WBD would be unreasonable, arbitrary, and capricious, and that, because WBD did not participate in the proceeding establishing the rules, they could not lawfully be applied to its wells. WBD also joined Attorney General Dan Morales as a defendant pursuant to 42 U.S.C.A. § 1983 (West 1994) to enjoin him from enforcing the rules as inconsistent with the laws and Constitution of the United States. The trial court dismissed the suit for lack of jurisdiction. On appeal, WBD asserts several bases for the assumption by a Travis County district court of jurisdiction in this case, including: the Uniform Declaratory Judgments Act, Tex. Civ. Prac. & Rem. Code Ann. ch. 37 (West 1997); the Texas Administrative Procedure Act, Tex. Gov't Code Ann. § 2001.038 (West 1997); Tex. Nat. Res.Code Ann. § 85.241 (West 1993); 42 U.S.C.A. § 1983 (West 1994); and the Constitutions of Texas and the United States.

## DISCUSSION

In determining whether a trial court has jurisdiction of a cause of action, the good-faith allegations made in the petition are determinative. *Brannon v. Pacific Employers Ins. Co.*, 148 Tex. 289, 224 S.W.2d 466, 469 (1949); *Firemen's Ins. Co. v. Board of Regents of the Univ. of Tex. System*, 909 S.W.2d 540, 541 (Tex.App.— Austin 1995, writ denied). The reviewing court construes the pleadings in the plaintiff's favor and looks to the intent of the pleader. *Texas Ass'n of Business v. Texas Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993). Thus, we look at WBD's pleadings to determine if the allegations assert causes of action over which a Travis County district court has jurisdiction.

A state district court has jurisdiction to review agency action only (1) as the result of a specific statutory grant by the legislature, or (2) in its inherent constitutional grant of jurisdiction in article V, section 8 of the Texas Constitution when an agency action violates a constitutional right or adversely affects a vested property right. *Stone v. Texas Liquor Control Bd.*, 417 S.W.2d 385, 386 (Tex.1967); *Sells v. Roose*, 769 S.W.2d 641, 643 (Tex.App.— Austin 1989, no writ). WBD asserts that the trial court here had jurisdiction on both bases.

### Statutory Basis

The most direct jurisdictional basis on which WBD relies as authorization for its action is section 2001.038 of the Texas Administrative Procedure Act (hereinafter "APA"). *See* Tex. Gov't Code Ann. § 2001.038 (West 1997). That section states in pertinent part:

(a) The validity or applicability of a rule, including an emergency rule adopted under Section 2001.043, may be determined in an action for declaratory judgment if it is alleged that the rule or its threatened application interferes with or impairs, or threatens to impair, a legal right or privilege of the plaintiff.

(b) The action may be brought only in a Travis County district court.

APA § 2001.038(a), (b). WBD argues that the Panhandle Field rules may be reviewed under section 2001.038 because that provision allows for direct judicial review of agency "rules" and because the Panhandle Field rules are included within the scope of that term. In response, the Commission contends section 2001.038 does not apply to the Panhandle Field rules because they were promulgated pursuant to the contested-case procedures of sections 2001.051–.147 of the APA rather than the notice-and-comment rulemaking procedures of sections 2001.023–.034.

We conclude that the trial court has jurisdiction to review the validity of the Panhandle Field rules pursuant to APA § 2001.038 for three reasons: (1) the Panhandle Field rules fall within the APA's definition of "rule" and meet the general requirements for an administrative rule; (2) the proceeding through which the Panhandle Field rules were adopted does *not* qualify as a "contested case" under the APA; and (3) the Commission is, in some circumstances, statutorily required to use trial-type procedures in promulgating field rules.

### I. The Panhandle Field Rules Fall Within the APA's Definition of "Rule" and Meet the General Requirements for an Administrative Rule

The APA defines "rule" as follows: "Rule"

(A) means a state agency statement of general applicability that:

(i) implements, interprets, or prescribes law or policy; or

(ii) describes the procedure or practice requirements of a state agency;

(B) includes the amendment or repeal of a prior rule; and

(C) does not include a statement regarding only the internal management

or organization of a state agency and not affecting private rights or procedures.

APA § 2001.003(6). Several factors lead us to conclude that the Panhandle Field rules fall within this definition.

First, the rules satisfy the literal requirements of the APA definition. They are clearly an agency statement. They implement, interpret, or prescribe law or policy. And they do not constitute statements regarding only the internal management or organization of the Commission without affecting private rights.[3] Thus, the only requirement about which there can be any bona fide disagreement is whether the rules constitute statements of "general applicability," since they do not have statewide impact but affect only the Panhandle Field.

A variety of sources support the conclusion that the mere fact that the Panhandle Field rules do not have statewide impact does not prevent them from being statements of general applicability. For example, the Texas APA was modeled after the Revised Model State Administrative Procedure Act of 1961. *See Commerce Indep. Sch. Dist. v. Texas Educ. Agency*, 859 S.W.2d 627, 630 (Tex.App.—Austin 1993, writ dism'd); Dudley D. McCalla, *The Administrative Procedure and Texas Register Act*, 28 Baylor L.Rev. 445 (1976); *see also* Model State Administrative Procedure Act (1961), 15 U.L.A. §§ 1–19 (1990). The definition of "rule" in section 2001.003(6) of the Texas APA is substantially identical to the definition in section 1(7) of the 1961 Model Act.[4] Significantly, the official comments to the 1961 Model Act state:

> Attention should be called to the fact that rules, like statutory provisions, may be of "general applicability" even though they may be of immediate concern to only a single person or corporation, provided the form is general and others who may qualify in the future will fall within its provisions.

Model State Administrative Procedure Act (1961) § 1(7) cmt., 15 U.L.A. 147, 149 (1990). The official comments to the 1981 version of the Model Act repeat this statement. *See* Model State Administrative Procedure Act (1981) § 1–102(10) cmt., 15 U.L.A. 7, 14 (1990).

One of the foremost commentators on state administrative rulemaking agrees. Commenting on the definition of "rule" contained in the 1981 Model Act, which is

---

3. Professor Bonfield has described the purpose of this statutory exclusion as follows:
   [This exclusion] is meant to assure that matters of internal agency management that are purely of agency concern are effectively excluded from normal rulemaking requirements. Such an exclusion is justified because of the undue burden on the agencies and small public benefit to be gained from utilization of such procedures for these statements. On the other hand, the limitations found in [the exclusion] are meant to assure that agencies do not abuse that exception to the public's detriment. Arthur Earl Bonfield, *The Iowa Administrative Procedure Act: Background, Construction, Applicability, Public Access to Agency Law, the Rulemaking Process*, 60 Iowa L.Rev. 731, 834 (1975) (commenting on a provision of the Iowa APA almost identical to section 2001.003(6)(C) of the Texas APA).

4. Section 1(7) of the 1961 Model Act provided that

   'rule' means each agency statement of general applicability that implements, interprets, or prescribes law or policy, or describes the organization, procedure, or practice requirements of any agency. The term includes the amendment or repeal of a prior rule, but does not include (A) statements concerning only the internal management of an agency and not affecting private rights or procedures available to the public, or (B) declaratory rulings issued pursuant to Section 8, or (C) intra-agency memoranda.

   For an analysis of the differences between the definition contained in the original Texas act (which was carried into APA § 2001.003(6) by non-substantive codification in 1993) and the definition in section 1(7) of the 1961 Model Act, see Dudley D. McCalla, *The Administrative Procedure and Texas Register Act*, 28 Baylor L.Rev. 445, 448–49 (1976).

similar to that in the 1961 version, Professor Bonfield states:

> The phrase "the whole or a part of an agency statement of *general* applicability" is probably the most important concept in the definition of "rule." Every statement implementing, interpreting, or prescribing law or policy that is *directed at a class by description, that is, directed at all persons similarly situated*, rather than at named individuals, is thus within the ambit of the definition. Statements of general applicability are to be distinguished from statements of particular applicability, which are addressed to specified individuals rather than to all individuals who are similarly situated.

Arthur Earl Bonfield, *State Administrative Rule Making* § 3.3.1, at 75 (1986) (emphasis in original).

In addition, this Court itself has so held. Referring to Railroad Commission Rule 90(b)(2), which we held to be a field rule "for all intents and purposes," we stated:

> A "rule" is defined in the APA as "a state agency statement of general applicability." APA § 2001.003. Although Rule 90(b)(2) does not apply to all oil fields in the state, we believe it still can be considered to be of "general applicability" and therefore to fall within the APA's definition of a "rule."

*Railroad Comm'n v. ARCO Oil & Gas Co.*, 876 S.W.2d 473, 486 n. 7 (Tex.App.—Austin 1994, writ denied).

Finally, courts of other jurisdictions also agree. The Wisconsin Supreme Court concisely stated the proper rule as follows:

> [T]o be of general application, a rule need not apply to all persons within the state. Even though an action applies only to persons within a small class, the action is of general application if that class is described in general terms and new members can be added to the class.

*Citizens for Sensible Zoning Inc. v. Department of Natural Resources*, 90 Wis.2d 804, 280 N.W.2d 702, 707–08 (1979) (Abra-hamson, J.); *see also Grand River Dam Auth. v. State*, 645 P.2d 1011, 1016 (Okl. 1982) ("As the Comment to the Revised Model Act explains, rules—like statutes—may be of 'general applicability' even though they may be of immediate concern only to a single person, provided that the form is general and others who may qualify in the future come within its provisions."); *Simpson Tacoma Kraft Co. v. Department of Ecology*, 119 Wash.2d 640, 835 P.2d 1030, 1035 (1992).

Apart from the statutory definition of the term "rule," there are a number of commonly cited *general* requirements of an administrative rule. *See* Arthur Earl Bonfield, *The Iowa Administrative Procedure Act: Background, Construction, Applicability, Public Access to Agency Law, the Rulemaking Process*, 60 Iowa L.Rev. 731, 824–26 (1975). The Panhandle Field rules satisfy all such general requirements:

First, the Panhandle Field rules—the relevant "agency statement" here—were not directed at named individuals, but at a class or category described in general terms: operators of oil and/or gas wells in the Panhandle Field. Although all operators in the Panhandle Field apparently received individual notice of the initiation of the proceeding, even a casual glance at the rules themselves reveals their general nature:

### Oil Field Rules

**Rule 1.** Panhandle Field oil wells are restricted to . . . . No person in possession of or operating an oil well may . . . .

**Rule 2.** No oil well shall hereafter be drilled nearer than . . . .

**Rule 3.** . . . . No proration unit shall consist of more than . . . . All proration units, however, shall consist of . . . . An operator, at his option, shall be permitted to . . . . Operators shall file . . . .

**Rule 4.** The top allowable for oil wells on a 20 acre unit is . . . . The max-

imum daily oil allowable for each well shall be....

**Rule 5.** An oil well shall be allowed to produce....

*Gas Field Rules*

....

**Rule 2.** No gas well in the Panhandle, West field shall hereafter be drilled nearer than....

**Rule 3.** .... No gas proration unit shall....All such proration units shall consist of....Operators shall file....

**Rule 4.** The daily allowable production of gas from individual gas wells completed in the Panhandle, West and East gas fields, shall be....

....

**Rule 6.** Gas wells in the Panhandle, West field shall be....

Second, new members could be added to the class in the future. Nothing in the Panhandle Field rules excludes from the operation of the rules new operators who drill or obtain oil or gas wells in the Panhandle Field *after* the rules' adoption. It is obvious that the Commission intended for the rules to apply to all persons who, in the future, become operators in the Panhandle Field. This is the method by which the Commission historically has produced field rules. As one commentator has noted:

Texas agencies can and do make rules in hybrid proceedings. For nearly sixty years now the Railroad Commission has made field rules using contested case procedures.... The Commission uses contested-case procedures, allowing parties to conduct discovery, present testimony, and cross-examine opposing parties' witnesses. Yet at the end the Commission issues rules of general applicability binding on all operators in a field, whether they participated in the hearing, or merely had notice of it, or

even commenced operations in the field after the rules are adopted.

Peter Schenkkan, *Judicial Review of Agency Rules & Actions Under APTRA Section 12,* State Bar of Texas 5th Annual Advanced Administrative Law Course at U–7 (1993). Schenkkan went on to conclude: "Section 12 [now APA § 2001.038] is certainly not solely for judicial review of the results of Section 5 [now APA §§ 2001.023–.034] rulemakings." *Id.*

Third, the agency statement was prospective in operation. Again, the Panhandle Field rules clearly look to the future. Indeed, to the extent the rules were to be applied to existing wells, they expressly established a one-year grace period for operators to bring such wells into compliance.

Finally, the Panhandle Field rules would not become concretely operative against any individual until there had been a further proceeding involving that individual. For example, the rules obviously contemplate an additional "enforcement"-type hearing before any individual can be fined or otherwise sanctioned for a violation of the rules.

Thus, the Panhandle Field rules fall within the APA's definition of "rule" and satisfy the general requirements of an administrative rule.

## II. The Proceeding by Which the Panhandle Field Rules Were Adopted Does **Not** *Fall Within the APA's Definition of "Contested Case"*

The APA defines "contested case" as follows: " 'Contested case' means a proceeding, including a ratemaking or licensing proceeding, in which the legal rights, duties, or privileges of a party are to be determined by a state agency after an opportunity for adjudicative hearing." APA § 2001.003(1). The proceeding by which the Panhandle Field rules were adopted was not a contested case because the Commission's hearing was not an "ad-

judicative" one.[5]

To "adjudicate" is to settle *judicially,* i.e., in the exercise of judicial or quasi-judicial authority. *Rutherford Oil Corp. v. General Land Office,* 776 S.W.2d 232, 234 (Tex.App.—Austin 1989, no writ); *see also* Black's Law Dictionary 42 (6th ed.1990); *Webster's Third New International Dictionary* 27 (Philip B. Gove ed., 1986); Bryan A. Garner, *A Dictionary of Modern Legal Usage* 27 (2d ed.1995). This Court has recognized the inherently judicial nature of the "adjudicative hearing" required in a contested case. Commenting on the definition of "contested case" found in APA § 2001.003(1), we stated: "By 'adjudicative hearing,' we think the legislature meant a hearing at which the decision-making agency hears evidence and, based on that evidence and *acting in a judicial or quasi-judicial capacity,* determines the rights, duties, or privileges of parties before it." *Best & Co. v. Texas State Bd. of Plumbing Examiners,* 927 S.W.2d 306, 309 n. 1 (Tex. App.—Austin 1996, writ denied) (emphasis added); *accord Ramirez v. Texas State Bd. of Medical Examiners,* 927 S.W.2d 770, 772 (Tex.App.—Austin 1996, no writ). In the present case, therefore, determining whether the Commission was exercising a legislative function or a judicial function is crucial in deciding whether the hearing conducted by the Commission was an "adjudicative" one.

The Texas Supreme Court has addressed the legislative/judicial distinction on more than one occasion. In *Key Western Life Insurance Co. v. State Board of Insurance,* 163 Tex. 11, 350 S.W.2d 839 (1961), the court said:

> Many definitions of legislative functions and judicial functions have been set forth by various courts. The Supreme Court of the United States stated:

> "A judicial inquiry investigates, declares, and enforces liabilities as they stand on present or past facts and under laws supposed already to exist. That is its purpose and end. Legislation, on the other hand, looks to the future and changes existing conditions by making a new rule, to be applied thereafter to all or some part of those subject to its power." *Prentis v. Atlantic Coast Line,* 211 U.S. 210, 29 S.Ct. 67, 69, 53 L.Ed. 150.

In 73 C.J.S. Public Administrative Bodies and Procedure § 8, p. 306, it is said:

> "It has been stated that the nature of the final act and the character of the process and operation, rather than the general character of the authority exercised, is determinative. The action of an administrative body or officer is adjudicatory in character if it is particular and immediate, rather than, as in the case of legislative or rulemaking action, general and future in effect."

*Key Western Life,* 350 S.W.2d at 847.

In discussing the legislative nature of setting utility rates, the supreme court said in another pre-APA case:

> It is fundamental that in Texas the fixing of domestic utility rates is a legislative function of the state government.... Utility rates as rules of conduct are prospective only and do not in any manner involve an "adjudication" of rights arising from a "past" controversy. It is true that the fixing of rates requires a study of existing and past facts, but the rate as promulgated is not "res adjudicata" of any fact so studied.

*Railroad Comm'n v. Houston Natural Gas Corp.,* 155 Tex. 502, 289 S.W.2d 559, 562 (1956).

---

5. In the 1961 Model State Administrative Procedure Act, on which the Texas APA was based, the term "hearing" was not preceded by the modifier "adjudicative." The Texas Legislature added that modifier to emphasize the distinction between the type of hearing required in a contested case and the type of hearing required in a rulemaking proceeding. *See* Dudley D. McCalla, *The Administrative Procedure and Texas Register Act,* 28 Baylor L.Rev. 445, 448 (1976).

This Court too has addressed the general distinction between legislative action and judicial action:

> A government function is legislative, and not judicial, when it "looks to the future and changes existing conditions by making a new rule, to be applied thereafter to all or part of those subject to its power." *Prentis v. Atlantic Coast Line Co.,* 211 U.S. 210, 226, 29 S.Ct. 67, 69, 53 L.Ed. 150 (1908). Therefore, the Ordinance clearly is legislative because it regulates future behavior rather than adjudicating past disputes.

*City of Austin v. Quick,* 930 S.W.2d 678, 684 (Tex.App.—Austin 1996), *aff'd, as modified,* 7 S.W.3d 109 (Tex. 1999).

Applying the foregoing standards, the Commission's proceeding by which the Panhandle Field rules were adopted was not an "adjudicative" one. Although trial-type procedures were used, no individual party's rights, duties, or privileges were *adjudicated.* Many of the same reasons why the Panhandle Field rules qualify as "rules" are the same reasons why the proceeding does not qualify as a "contested case." The character of the Commission's proceeding did not change in midstream: from the outset, its purpose was to produce rules. And what was produced was an agency statement (1) that was not stated to apply to specifically named individuals, but to a generally described class or category (operators in the Panhandle Field), (2) to which new members—who would be bound by the rules—could be added later, (3) which would be prospective in operation, and (4) which would not be concretely applicable to any individual without a further proceeding involving that individual. These characteristics are the essence of a rule and the antithesis of an adjudication.

Accordingly, the proceeding by which the Panhandle Field rules were adopted was not a contested case.

## III. The Commission is Statutorily Required to Use Trial–Type Procedures in Promulgating Field Rules in Some Circumstances

■ The fact that the Panhandle Field rules were adopted pursuant to trial-type procedures is immaterial to the issue of whether the rules may be challenged under APA § 2001.038. As we held in *ARCO,* the purpose of the APA was only to establish *minimum* procedural standards; accordingly, "there is nothing in the APA preventing an agency from employing contested-case procedures in promulgating rules." *ARCO,* 876 S.W.2d at 489; *see also* APA § 2001.001(1). We also noted that "[a]lthough the purpose of a rulemaking proceeding is essentially investigative rather than adjudicative, we perceive no reason why there should be only a single manner in which a factual investigation may be conducted. An evidentiary, trial-type hearing is clearly one way to investigate facts." *ARCO,* 876 S.W.2d at 489 n. 8. Finally, we held that the Commission's enabling statute, originally enacted in 1935, *requires* the use of trial-type procedures in promulgating field rules for the purpose of protecting correlative rights. *Id.* at 484–88; *see also* Tex. Nat. Res.Code Ann. §§ 85.049–.053 (West 1993). As with any statute, the APA is presumed to have been enacted with complete knowledge of existing statutory provisions and with reference to them. *See Acker v. Texas Water Comm'n,* 790 S.W.2d 299, 301 (Tex.1990). We can think of no reason why the legislature would have wanted rules adopted pursuant to those statutorily required procedures to be immune from challenge under APA § 2001.038.

■ Finally, the fact that the Commission's document adopting the Panhandle Field rules is called an "order" is also immaterial. Even rules promulgated pursuant to the APA's notice-and-comment rulemaking procedures are adopted pursuant to an "order." *See* APA § 2001.033 ("A state agency order finally adopting a rule must include . . . ."); *see also Pacific*

*Northwest Bell Tel. Co. v. Eachus,* 107 Or.App. 539, 813 P.2d 46, 48 (1991) (agency denomination of statement as "order" does not make it an order when statement falls within statutory definition of "rule").

■■■ We hold that the district court of Travis County has jurisdiction pursuant to APA § 2001.038 to hear WBD's challenge to the validity and/or applicability of the Panhandle Field rules.[6] Accordingly, we need not address the numerous other jurisdictional bases WBD asserts.

### *Collateral Attack/Exhaustion of Remedies*

■■■ In addition, the Commission contends that WBD's suit is an impermissible collateral attack on a final order from a contested case and that a party wishing to challenge such an order needs to exhaust all administrative remedies before seeking judicial review. The general rule is that an agency's final order is immune from collateral attack, as is the final judgment of a court. *Alamo Express, Inc. v.*

*Union City Transfer,* 158 Tex. 234, 309 S.W.2d 815, 827 (1958); *Public Utility Comm'n v. Allcomm Long Distance, Inc.,* 902 S.W.2d 662, 666 (Tex.App.—Austin 1995, writ denied). Because this action is brought under section 2001.038, however, it constitutes a *direct* attack on the Commission's field rules. "A court may render a declaratory judgment without regard to whether the plaintiff requested the state agency to rule on the validity or applicability of the rule in question." APA § 2001.038(d). Thus, an aggrieved party does not have to exhaust all possible agency remedies before bringing an action under section 2001.038. *Texas Dep't of Human Servs. v. ARA Living Ctrs. of Tex., Inc.,* 833 S.W.2d 689, 692 (Tex.App.—Austin 1992, writ denied).

### *Primary Jurisdiction*

■■■ Finally, the Commission contends the doctrine of primary jurisdiction prevents the district court from hearing an "as-applied" challenge to the constitution-

---

**6.** We do not share the concerns expressed in the dissenting opinion. Initially, the dissent argues that the result we reach mandates that the term "rule" be given a broad meaning in APA § 2001.038 and a different meaning in other sections of the APA. Our holding does not produce such an effect. Rather, the term "rule" should be given a broad construction throughout the APA. Giving it a broad construction in the notice-and-comment procedure sections increases the instances in which agencies will have to give notice to the public of proposed rules, thereby furthering the stated policy of "provid[ing] for public participation in the rulemaking process." APA § 2001.001(2). Giving the term a broad construction in section 2001.038 makes it easier for an aggrieved party to challenge a rule that has been promulgated *without* the requisite opportunity for public participation or that is invalid for some other reason. This portion of the dissenting opinion also ignores two important factors: first, that the APA establishes only *minimum* standards of practice and procedure for administrative agencies, see APA § 2001.001(1); and second, that the issue here is whether an agency statement adopted under certain procedures is challengeable at all under APA § 2001.038, not whether an agency statement adopted under those procedures is valid.

The dissent next argues that our holding will have "paralyzing consequences," asserting in effect that every letter, memo, and brief sent or filed by an agency will be subject to challenge under section 2001.038. No such consequences will occur. To be of "general applicability" and therefore challengeable under APA § 2001.038, such a statement would not only have to be stated in terms of a general class or category of persons, but would also have to be intended to be binding on that general class or category. It is difficult to imagine a context in which an agency would issue a letter, memo, or brief containing such a statement. But in the event it did, then by all means such a statement *should* be subject to challenge under section 2001.038. With respect to the dissent's comments on the setting of public utility rates, we simply note that the APA expressly declares a ratemaking proceeding to be a contested case. *See* APA § 2001.003(1). This provision arguably reveals a legislative intent that contested-case procedures should be the exclusive means for obtaining judicial review of a ratemaking order, although we emphasize that this question is not before us and we express no opinion thereon. It is definitely not, however, our intention to engraft onto the APA two methods for simultaneous judicial review of the same order.

ality of the Panhandle Field rules. The supreme court, however, has declared the Railroad Commission's primary jurisdiction "not to be so broad-sweeping as to oust the courts of jurisdiction just because the Commission might have jurisdiction to determine some facts related to the controversy." *Amarillo Oil Co. v. Energy–Agri Prods., Inc.*, 794 S.W.2d 20, 26 (Tex. 1990). The precise function of the doctrine of primary jurisdiction is to guide a court in determining whether it should refrain from exercising its jurisdiction until after an administrative agency has determined the relevant question, or some aspect of the question, posed to the court. Kenneth C. Davis, *Administrative Law Treatise* § 19.01, at 373 (1972). As this Court has stated, the primary-jurisdiction doctrine merely prevents a court from ruling on certain types of questions before they have been decided by the administrative agency. *ARCO*, 876 S.W.2d at 478. In *ARCO*, we held that because the Commission decided the question at issue when it adopted the challenged rule, the primary-jurisdiction doctrine did not deprive the court of jurisdiction to determine the validity of the rule. *Id.*

█ Furthermore, it is an exception to the doctrine of primary jurisdiction that a court may proceed when an agency is exercising authority beyond its statutorily conferred powers. *ARA Living Ctrs.*, 833 S.W.2d at 692. Because we find the challenge to the Panhandle Field rules to be authorized by APA § 2001.038, and because we consider the promulgation of these rules as a final "decision" of the Commission on the subject matter they address, we conclude that the doctrine of primary jurisdiction does not prevent a Travis County district court from hearing WBD's suit.

The Commission also argues that it should at least maintain jurisdiction to consider the issues of compliance specific to WBD's wells. In *ARCO*, we rejected a similar argument by the Commission that it should be allowed to conduct exception hearings before the issue was heard in court:

> We will not force the oil companies to be subjected to potential irreparable injury while the Commission completes its exception hearings. As the Texas Supreme Court has explained, "An administrative body cannot, by reserving for itself the power to change a ruling, deprive the courts of jurisdiction to the detriment of the parties injured by the ruling." Because Rule 90 went into effect immediately upon its enactment, the oil companies had the immediate right to turn to the courts for relief. . . . We will not require the oil companies to first be subjected to Rule 90(b)(2) before they may challenge its validity.

*ARCO*, 876 S.W.2d at 479 (citations omitted). This reasoning applies to the Panhandle Field rules as well. WBD has alleged that one or more of its wells have already been sealed by the Commission pursuant to those rules. WBD does not allege that the Commission has improperly applied its own rules, but that even the "proper" application of the field rules violates various statutory and constitutional provisions. Under these circumstances, the possibility that relief might be provided by a contested-case proceeding within the agency concerning well-compliance or exception issues is not sufficient to deny jurisdiction to the Travis County district courts to hear a challenge brought under APA § 2001.038.

### CONCLUSION

We hold that a Travis County district court has jurisdiction to hear the claims asserted by WBD. Accordingly, we reverse the district court's order dismissing WBD's suit for want of jurisdiction, and we remand the cause to that court for further proceedings.

KIDD, Justice, concurring.

On motion for rehearing, I choose to write separately to clarify, and in my view harmonize, the majority and dissenting

opinions. I believe that our decision is controlled, in the main, by our prior decision in *Railroad Commission v. ARCO Oil & Gas Co.*, 876 S.W.2d 473 (Tex.App.—Austin 1994, writ denied). In *ARCO,* we recognized a historical anachronism that has existed in oil and gas law for over sixty years and certainly predates the existence of APTRA, now known as the Texas Administrative Procedure Act ("APA"). Tex.Gov't Code Ann. §§ 2001.001–.902 (West 2000). The Railroad Commission, in propounding field rules, employs a hybrid procedure which blends both legislative rulemaking and contested-case procedures into one docket. In the instant cause, just as we recognized in *ARCO,* the Railroad Commission utilized this hybrid procedure to propound new field rules for the Panhandle Field. Accordingly, the Commission gave notice to "all affected operators" of wells in the Panhandle oil and gas fields, inviting them to participate as formally designated parties in an evidentiary hearing. WBD voluntarily chose not to participate in this contested-case type evidentiary hearing, but rather decided at a later date to challenge the Panhandle Field rules by the declaratory-judgment procedure provided for by section 2001.038 of the APA. *See id.* § 2001.038 (West 2000). The district court dismissed WBD's lawsuit. It seems axiomatic to me that, having stated in *ARCO* that "field rules" promulgated by the Railroad Commission pursuant to this hybrid procedure are in fact *rules,* pursuant to our holding in *ARCO,* WBD must be permitted to challenge these Panhandle Field rules under section 2001.038, as provided for by the APA. *See id.* With that said, I wish to stress in this concurrence my view of just how narrow I believe this Court's holding to be: It applies only to field rules propounded by the Railroad Commission and not to any of the other exceptions mentioned by the dissent. We express no opinion on the merits of WBD's rule challenge. Nor do we offer an opinion on whether WBD's challenge was timely brought.[1] We simply hold that the district court erred in dismissing this cause for want of jurisdiction.[2] Therefore, I concur in the majority opinion in reversing the district court's order of dismissal and remanding this cause to the trial court for further proceedings.

JOHN POWERS, Justice (Retired), dissenting.

I substitute the following for my previous dissenting opinion.

The majority opinion[1] finds trial-court jurisdiction in section 2001.038 of the Administrative Procedure Act (APA),[2] a statute that authorizes a cause of action for declaratory judgment to determine the validity or applicability of an administrative-agency *rule.* Essential to the majority's theory is a related conclusion that the Panhandle Field Rules constitute a rule within the meaning of section 2001.038. *See* Tex.Gov't Code Ann. § 2001.038 (West 2000). I disagree with this related conclusion.

---

**1.** The Railroad Commission contends that WBD's lawsuit is barred by section 2001.035 of the APA which requires that a person "must initiate a proceeding to contest a rule on the ground of noncompliance with the procedural requirements of Sections 2001.0225 through 2001.034 not later than the second anniversary of the effective date of the rule." Tex.Gov't Code Ann. § 2001.035(b) (West 2000). This issue is not before us, however, and must be urged in the trial court.

**2.** *See Dubai Petroleum Co. v. Kazi,* 12 S.W.3d 71, 73 (Tex.2000).

**1.** I follow the lead of Justice Kidd's concurring opinion in referring to Justice Jones's opinion as the "majority opinion."

**2.** The Administrative Procedure Act is found in sections 2001.001 through 2001.902 of the Texas Government Code. *See* Tex.Gov't Code Ann. §§ 2001.001–.902 (West 2000). Section numbers in the text of my opinion refer to sections of the APA and the Texas Government Code.

Insofar as it is applicable here, section 2001.003(6) defines the word *rule* to mean "a state agency statement of general applicability that ... implements, interprets, or prescribes law or policy." Tex.Gov't Code Ann. § 2001.003(6) (West 2000). It is easy to see that the Panhandle Field Rules fit nicely into this statutory definition. For the majority, that is enough. I disagree for reasons I will set out below.

The concurring opinion states that the holding in the majority opinion is a narrow one. The holding referred to, I should think, is the majority's basic conclusion that *any* agency statement is a rule if in ordinary usage the words of the statement fit the definition of a rule set forth in section 2001.003(6). That this construction is a narrow one is not suggested by the language of the majority opinion. And the construction the majority place upon section 2001.003(6) is necessarily a precedent for all other cases involving the same issue; within this court's geographical jurisdiction that construction is presumably binding. In fact, another panel of this Court has so treated the majority opinion. *See Texas Alcoholic Beverage Comm'n v. Amusement & Music Operators, Inc.*, 997 S.W.2d 651, 660 (Tex.App.—Austin 1999, pet. dism'd). We surely will *not* be free to give section 2001.003(6) a different construction in any future appeal without reversing the majority holding herein.

The intended meaning of a declaration ordinarily depends upon the context in which it was made. For example, the statement that "Yesterday was a fine day" may be true when made at one time and false at another. Under the theory of the majority opinion, however, the context of any and all agency statements becomes irrelevant in deciding whether a particular agency statement amounts to a *rule* as that word is defined in section 2001.003(6). The sole issue for the majority is abstract and lexical: May it be said the statement in question is one of general applicability that implements, interprets, or prescribes anything includable in the broad concepts of "law" or "policy"? If so, the statement is a rule for purposes of sections 2001.003(6) and 2001.038. I do not believe the legislature intended that these sections be understood and applied in that manner.

I believe section 2001.003(6) must be understood and applied in the particular context in which the legislature established that definition of the word *rule*—the administrative processes required and expected of state administrative agencies. These agencies are constituted for the very purpose of formulating and issuing statements of general (or particular) applicability that implement, interpret, and in many cases prescribe law or policy. Administrative agencies do little else. If an agency possesses rulemaking power, such statements *may* take the form of rules as the agency decides in its discretion.[3] But agencies routinely make statements of this kind, of general applicability, in a myriad of other forms as well. These range from statements made in the course of adjudicating contested cases, to such things as the inclusion of minority set-asides in construction contracts let by the agency, and even to an agency's "raised eyebrow" that coerces conduct in a regulated field. *See* Alfred C. Aman, Jr., & William T. Mayton, *Administrative Law* § 4.1, at 80–82 (1993). For example, in the course of adjudicating a contested case conducted by an adminis-

---

**3.** There is, of course, a familiar administrative-law doctrine that an agency statement of law or policy may not be legally enforceable against an affected person *unless and until* it is promulgated in the form of an agency rule. *See, e.g., Citizens Against the Lewis and Clark (Mowery) Landfill v. Pottawattamie County. Bd. of Adjustment,* 277 N.W.2d 921, 922–25 (Iowa 1979); *Adams v. Prof'l Practices Comm'n,* 524 P.2d 932, 934 (Okla.1974); *Sun Ray Drive-in Dairy, Inc. v. Oregon Liquor Control Comm'n,* 16 Or.App. 63, 517 P.2d 289, 292–93 (Or.Ct.App.1973); *Mazza v. Cavicchia,* 15 N.J. 498, 105 A.2d 545, 552 (N.J.1954). The majority holding and rationale seem largely to abolish this doctrine as being superfluous: *No* statement of law or policy, if of general applicability, is valid under the majority's holding *unless* promulgated as a rule.

trative-law judge assigned by the State Office of Administrative Hearings, an agency is required to provide that official "with a written statement of applicable rules *or policies*"; and, the agency may revise his or her determination "only if the agency determines [he or she] did not properly apply or interpret applicable law, agency rules, *written policies* [so provided], or prior administrative decisions." Tex.Gov't Code Ann. § 2001.058(c), (e)(1) (West 2000) (emphasis added). The legislature cannot have intended an absurdity—which the majority opinion requires—that the contested case must stop in midcourse to await the agency's promulgation and indexing of an actual rule that embodies the "written policy" furnished the administrative-law judge. The disjunctive "or" in these statutory passages, distinguishing between "rules" and "policies," is not the result of a slip of the legislative pen. And it demonstrates plainly that not all general statements of binding agency policy can or do take the form of rules. *See Amarillo Indep. Sch. Dist. v. Meno,* 854 S.W.2d 950, 957–58 (Tex.App.—Austin 1993, writ ref'd n.r.e.).

In short, the majority opinion condemns as *categorically* invalid *all* agency statements of general applicability, implementing, interpreting, or prescribing law or policy, *unless* such statements take the form of rules promulgated through APA rulemaking procedures. Recourse to declaratory relief from any such non-rule statements, under section 2001.038, is hereafter unnecessary—the statements are by definition invalid and unenforceable when issued. An injunction against enforcement of such statements will now suffice. They are dead letters *ab initio* by force of the majority's construction of section 2001.003(6) in this appeal. One might be forgiven for raising an eyebrow at that construction.

## A RULE IS THE PRODUCT OF RULEMAKING PROCEDURES MANDATED BY THE APA

In its adoption of section 2001.003(6), I believe the legislature had in mind the *conventional* understanding of what a rule is: the product of an agency rulemaking proceeding, the only kind of agency proceeding that can possibly produce an actual rule. And, section 2001.038 assumes in my view an actual rule in its creation of a cause of action to determine the validity or applicability of an agency rule.

The definition in section 2001.003(6) is taken almost verbatim from section (1)(7) of the 1961 Model State Administrative Procedure Act [4] promulgated by the National Conference of Commissioners on Uniform State Laws. The Commissioners' purpose, and presumably the legislature's purpose, in so defining the word *rule,* was to preclude agency attempts at avoiding the rigors of notice-and-comment rulemaking imposed by the APA by merely assigning titles other than *rule* to their statements implementing, interpreting, or prescribing law or policy. In the Commissioners' view, the definition in section (1)(7) of the model act was "necessary to defeat the inclination shown by some agencies to label as 'bulletins,' 'announcements,' 'guides,' 'interpretative bulletins,' and the like, announcements which in legal operation and effect, really amount to rules; and then to assert that their promulgations are not technically rules but merely policy statements, and *hence may be issued without observance of the procedures required in connection with the adoption of rules.*" 1 Frank E. Cooper, *State Administrative Law* 108 (1965) (emphasis added). The definition was thus *not* intended to be a substitute for the conventional meaning of the word *rule* in administrative law, but rather a support for the doctrine that some agency statements of law or policy may not be en-

---

4. The 1961 Model State Administrative Procedure Act is found in 15 Uniform Laws Anno-

tated 147–554 (1990).

forced unless and until promulgated as rules.[5]

The "core of meaning" of the word *rule* "is generally understood and may be simply described. A rule ... *is the product of rulemaking,* and rulemaking is the part of the administrative process that resembles a legislature's enactment of a statute." Kenneth Culp Davis, *Administrative Law Text* § 5.01 at 123 (1972) (emphasis added). "A 'rule' therefore *is the product of rulemaking*—the agency process resembling the action of a legislature enacting a typical statute." Arthur Earl Bonfield, *State Administrative Rulemaking* § 3.3.1, at 76 (1986) (emphasis added); *see, e.g., Texas County Irrigation & Water Res. Ass'n v. Oklahoma Water Res. Bd.,* 803 P.2d 1119, 1123–24 (Okla.1990); *Ellis v. Utah State Ret. Bd.,* 757 P.2d 882, 888 (Utah Ct.App.1988); *Moulton v. State,* 363 N.W.2d 405, 406–07 (S.D.1985). This conventional meaning is implicit in the rulemaking procedures of the APA itself.

The definition of the word *rule* in section 2001.003(6) does not exist in a statutory or experiential vacuum, as the majority opinion appears to assume. The definition in that section and the use of the word *rule* in section 2001.038 (authorizing a declaratory-judgment action directed at an agency rule) have a specific context—the APA and the administrative process generally. The structure of the APA—the physical and logical relation between its several parts—demonstrates unequivocally the legislature's intent that the word *rule* shall mean the product of an agency *rulemaking* proceeding.

The APA consists of two basic divisions. Sections 2001.051 through 2001.147 govern *contested-case* proceedings in agencies subject to the APA. Sections 2001.021 through 2001.037 govern *rulemaking* in the agencies; and section 2001.038 authorizes a declaratory-judgment action for the judicial review of agency rules.

There can be no doubt that the word *rule* was intended to have the *same* meaning throughout all sections of the APA. That is why the legislature began section 2001.003 (wherein the word *rule* is defined) with the expression "In this chapter." Between section 2001.003(6) (defining the word *rule* ) and section 2001.038 (authorizing the declaratory-judgment action), the word *rule* occurs seventy-seven times in the various provisions that govern *rulemaking* in the agencies. It is not to be supposed then that the word *rule* can mean one thing in sections 2001.003(6) and 2001.038 and a vastly different thing in sections 2001.021 through 2001.037, establishing *rulemaking procedures.* For example, the adoption of an agency rule must be preceded by a notice with particular contents (section 2001.023), a local-employment impact statement (section 2001.022), and an opportunity for public comment (section 2001.029). The agency order finally adopting a rule must contain specified agency determinations (section 2001.033), and a rule is not effective until the agency has indexed the rule and made it available for public inspection (section 2001.005). Finally, an agency rule is not valid unless adopted in substantial compliance with the foregoing provisions (section 2001.035). Because the word *rule* requires use of these statutory procedures set forth in sections 2001.021 through 2001.037, then the word *rule* used in section 2001.038 (authorizing a declaratory-judgment action) must also connote a rule produced by and through those procedures. Otherwise, the word *rule* means different things in the several parts of the APA, contrary to the legislature's declared intent that the word shall mean the *same* thing throughout the APA.

Stated another way, it is obvious that the legislature intended the word *rule* to have a specific, technical meaning as it is used in the APA—the product of a rulemaking proceeding conducted under sections 2001.021 through 2001.037. When

5. *See* footnote 3, *supra.*

the legislature so declares the meaning of a word, courts are bound accordingly regardless of the meaning of the word in common usage or in other connections and contexts. *See Transport Ins. Co. v. Faircloth,* 898 S.W.2d 269, 273–74 (Tex.1995); *Eppstein v. State,* 105 Tex. 35, 143 S.W. 144, 146 (1912). The majority therefore err, in my view, when they affix to the word *rule* an expanded meaning that also includes agency statements promulgated *outside* these rulemaking procedures—in this instance an agency order adjudicating a contested case.

## THE CONSEQUENCES OF THE MAJORITY DECISION WILL BE VEXATIOUS

The Panhandle Field rules were not promulgated in a Commission rulemaking proceeding, but in a contested-case or adjudicative proceeding in which the agency decided issues of fact and law based upon evidence adduced, employing trial-type procedures in a controversy involving particular parties. *See* Tex.Gov't Code Ann. §§ 2001.051–.057 (West 2000). *Field rules may not constitutionally be promulgated in any other way.* They are in substance *adjudicated exceptions* to the *standard* spacing requirements of the Commission's famous "statewide rule" 37. Such exceptions are authorized based solely upon *evidence* from which the Commission reasonably concludes the particular features of the field require an exception to Rule 37 to prevent waste or an unconstitutional confiscation of private property. Trial-type or contested-case procedures are essential for the Commis-

sion to assure that the discrimination represented by the field rules has a *reasonable basis in fact* and is therefore constitutionally permissible. *Railroad Comm'n v. Shell Oil Co.,* 139 Tex. 66, 161 S.W.2d 1022, 1026–27 (1942). This assurance cannot possibly be obtained by informal or notice-and-comment rulemaking—the very procedure the majority opinion now requires of the Commission in its adoption of field rules.[6] Under notice-and-comment rulemaking pursuant to sections 2001.021 through 2001.037, persons affected by the resulting field rules will be deprived of property without due process of law because they will be denied the right to present evidence and argument as to the particulars of the field and their circumstances; the right to rebut adverse evidence through cross-examination and contrary evidence; the right to have the agency decision based upon evidence introduced into the record of the hearing; the right to a complete record containing a transcript of the testimony and arguments, the documentary evidence, and all papers filed in the proceeding; and the right to know the bases of the agency decision as reflected in findings of fact and conclusions of law.[7] *See* Bernard Schwartz, *Administrative Law,* § 5.1, at 203–04 (1984).

The majority decision means that every Commission statement, if it fits in common usage the definition of a *rule* in section 2001 .003(6), is invalid absent a rulemaking proceeding. One should think the legislature could not have intended the absurd and paralyzing consequences that will result. *Cf. Brinkley v. Texas Lottery*

---

6. The notice-and-comment rulemaking prescribed by the APA should not be confused with rulemaking based upon an official rulemaking record.

7. It goes without saying, of course, that persons affected by field rules adopted through notice-and-comment rulemaking are also deprived of the *statutory* rights given them in the various sections of the APA, such as the right to an evidentiary hearing in which they may present evidence and argument and respond to contrary evidence and argument

(§ 2001.051); the compilation of an evidentiary record (§ 2001.060); the prohibition of ex parte consultations (§ 2001.061); the right of cross-examination (§ 2001.087); the right to obtain subpoenas (§ 2001.089); and the right to findings of fact and conclusions of law based solely on evidence received and matters officially noticed (§ 2001.141). *See* Tex.Gov't Code Ann. §§ 2001.051, 2001.060, 2001.061, 2001.087, 2001.089, and 2001.141 (West 2000).

*Comm'n,* 986 S.W.2d 764, 769–71 (Tex. App.—Austin 1999, no pet.). Such dire results are not limited to past or future field rules adopted by the Commission. For example, the Commission has historically and efficiently made extensive use of its statutory power of unilateral *investigation* to determine any number of things relative to the lawful drilling, completion, operation, and plugging of wells. *See* Kenneth Culp Davis & York Y. Wilbern, *Administrative Control of Oil Production in Texas,* 22 Tex.L.Rev. 149, 158–59 (1944). Under the majority decision, the Commission's simple letter to its district engineers, directing them as a matter of law and policy to verify some aspect of wells located in their districts, will constitute an invalid attempt to promulgate a rule. In addition, some fields have only a single well and a single owner. It is doubtful the legislature intended that the Commission must employ in such cases the unnecessary and expensive procedure of notice-and-comment rulemaking. And any brief filed in this or another court by the Commission setting forth the agency's interpretation of an oil-and-gas statute amounts necessarily to a statement of the Commission's view of law and policy. Thus, the brief itself promulgates an invalid rule under the majority theory.

Consequently, the Commission is compelled by the majority decision to adopt rules before the agency may act at all in most areas of its administration. The agency is thus deprived entirely of the flexibility and discretion we have repeatedly said administrative agencies have—because they *must* have it—when they exercise both rulemaking and contested-case or adjudicative-type powers: a choice to make law and policy in the course of deciding contested cases *or* through rulemaking, within the limits of the abuse-of-discretion norm. *See, e.g., City of El Paso v. Public Util. Comm'n,* 883 S.W.2d 179, 188–89

(Tex.1994); *Brinkley,* 986 S.W.2d at 769–70. Whether the Commission has abused its discretion in the present case, by the choice it made, is not before us. *Cf. Madden v. Texas Bd. of Chiropractic Exam'rs,* 663 S.W.2d 622 (Tex.App.—Austin 1983, writ ref'd n.r.e.).

The ill consequences of the majority decision will affect similarly other regulatory agencies subject to the APA. Public utilities, for example, if they wish to increase their rates for electric or telecommunications services, *must* do so presently by initiating a contested-case proceeding. *See* Tex.Util.Code Ann. §§ 14.052–.057, 15.001, 36.105, 53.111 (West 1998). The fixing of utility rates in this manner is, of course, a "legislative" function under the majority's usage and a public utility's customers are a "class by description" in the majority's words. Under their rationale, the resulting rate order is actually a rule in legal effect because it necessarily interprets and implements the various statutory criteria that govern utility rate making.

Which manner and scope of judicial review shall we then apply in such a case? Presently, judicial review of rate orders is limited to questions of law and directed at the agency record with the deference required by the substantial—evidence rule. *See* Tex.Gov't Code Ann. §§ 2001.171–.1775 (West 2000). On the other hand, in a suit for declaratory judgment under section 2001.038, as mandated now by the majority decision, any record of agency proceedings is immaterial and the plaintiff may proceed *originally* in district court on any allegations of fact and law by which he contends the final order in the contested case is invalid or inapplicable—perhaps the most obvious claim being that the impugned "rule" is invalid for want of substantial compliance with the rulemaking provisions of the APA. The examples are easily multiplied.[8] I do not believe the

---

8. *See, e.g., Nueces Canyon Consol. Indep. Sch. Dist. v. Central Educ. Agency,* 917 S.W.2d 773 (Tex.1996) (detachment and annexation of school-district territory); *City of Lancaster v.*

*Texas Natural Res. Conservation Comm'n,* 935 S.W.2d 226 (Tex.App.—Austin 1996, writ denied) (solid-waste permit amendment); *Texas Rivers Protection Ass'n v. Texas Natural Res.*

legislature intended such absurd confusion and utter contradiction.

I should refer briefly to "the legislative/judicial distinction" urged by the majority. That distinction is based on the word *adjudicative* found in the APA definition of *contested case.* The term *contested case* is defined to mean "a proceeding ... in which the legal rights, duties, or privileges of a party are to be determined by a state agency after an opportunity for *adjudicative* hearing." Tex.Gov't Code Ann. § 2001.003(1) (West 2000) (emphasis added). The majority conclude the Panhandle Field Rules cannot be the product of a contested case because they are "legislative" in nature, rather than "adjudicative" as the foregoing definition requires. I disagree with this course of reasoning.

The 1961 Model Act provision from which the definition of "contested case" is taken does not include the adjective *adjudicative.* The reason the Texas legislature added the adjective is not complicated; the word was not intended to have substantive consequences. The word *adjudicative*

> was added simply to counter the criticism that the Model Act's definition failed to distinguish sharply between the "hearing" required in a contested case and the "public hearing" required in rulemaking proceedings.... Ostensibly, the word "hearing" could apply to either type of proceeding. The Texas draftsmen added the word "adjudicative" to emphasize that *a rulemaking proceeding did not become a contested case simply by virtue of the "public hearing" requirement.*

Robert W. Hamilton & J.J. Jewett, III, *The Administrative Procedure and Texas Register Act: Contested Cases and Judicial Review,* 54 Tex. L.Rev. 285, 287 (1976) (emphasis added). The "Texas draftsmen"

could not possibly have foreseen that the word *adjudicative* would be employed to the opposite substantive effect—to *convert* a contested-case or adjudicative-type proceeding into a defective and invalid rulemaking proceeding as the majority have done.

While the distinction between legislative and judicial functions is occasionally useful, the distinction is meaningless in the present context. Administrative agencies perform *administrative* functions exercising *administrative* powers delegated to them by statute. It is only by *analogy* that we refer to the agencies' functions as *legislative* or *adjudicative. See Missouri, K. & T. Ry. Co. of Texas v. Shannon,* 100 Tex. 379, 100 S.W. 138, 141 (1907); *American Surety Co. of New York v. Mays,* 157 S.W.2d 444 (Tex.Civ.App.—Waco 1941, writ ref'd w.o.m.). The agency proceeding that produced the Panhandle Field rules is what the *Shell Oil Company* decision, the statutes, and the constitution required it to be, what the Commission intended it to be, and what the record shows it to be—a contested—case proceeding conducted under the applicable provisions of the APA. A proceeding of that kind cannot possibly produce an agency *rule* as that word is used in section 2001.038 of the APA.

I do not mean by the foregoing discussion to gloss over the complexities inherent in distinguishing an agency rule from an agency order, the former issuing from an exercise of the agency's legislative-type power and the latter most often from the agency's adjudicative-type power. These complexities are set forth elsewhere. *See* Aman, Jr. & and Mayton, *Administrative Law,* § 4.1, at 80–82; Bonfield, *State Administrative Rulemaking,* §§ 3.1–3.3, at 59–95; Schwartz, *Administrative Law,* § 4.2, at 145–49. A discussion of such matters is not necessary here because of

---

*Conservation Comm'n,* 910 S.W.2d 147 (Tex. App.—Austin 1995, writ denied) (water-diversion permit); *City of Amarillo v. Railroad Comm'n,* 894 S.W.2d 491 (Tex.App.—Austin 1995, writ denied) (natural gas rates); *Texas Water Comm'n v. Lakeshore Util. Co.,* 877

S.W.2d 814 (Tex.App.—Austin 1994, writ denied) (water and sewer rates); *Smith v. Houston Chem. Servs., Inc.,* 872 S.W.2d 252 (Tex. App.—Austin 1994, writ denied) (issuance of solid-waste permit).

the simple, stark theory of the majority opinion—an agency statement is always a rule, without more, if the text of the statement fits from an abstract and lexical standpoint the definition in APA section 2001.003(6).

For the reasons given, I respectfully dissent.